*In re* MARRIAGE OF MARY C. FORD, Petitioner-Appellee, and WILLIAM FORD, Respondent-Appellant.

First District (4th Division)    No. 79-1317

Opinion filed December 18, 1980.—Rehearing denied January 16, 1981.

Bernard Hammer, Ltd., of Chicago, for appellant.

Laurie A. Shatsoff, of Chicago, for appellee.

Mr. JUSTICE JIGANTI delivered the opinion of the court:

The petitioner, Mary C. Ford, and the respondent, William Ford, were married on September 28, 1968. The parties had two children, Gary, born February 23, 1973, and Alice, born April 17, 1977. Mary Ford filed for divorce on May 2, 1977. Judgment was entered dissolving the parties' marriage on May 17, 1978. On May 23, 1979, the court granted custody of both children to Mary Ford.

William Ford's motion to vacate the custody order was denied on July 20, 1979. The court also denied his motion for a psychological examination of Gary Ford. Mary Ford was ordered to pay William Ford maintenance of $100 per month for four months and a hearing date was set to review the award. Each party was ordered to pay his own attorney's fees and each was granted the property in his possession, name or control. William Ford was granted liberal visitation.

William Ford appeals from those portions of the July 20 order concerning custody, maintenance, and attorney's fees. In support of his contention that the trial court erred in refusing to vacate the custody order, William Ford argues (1) the trial court abused its discretion in refusing to consider certain evidence of the mother's character and personality; (2) the trial court gave excessive negative consideration to William Ford's inability to jump, run, hop, or play certain sports; (3) the trial court gave disproportionate weight to the testimony of the court-appointed psychiatrist; (4) it was error to permit inquiry into his political beliefs; (5) it was error to permit inquiry into his religious beliefs; (6) the trial court exceeded the permissible scope of inquiry during an *in camera* interview with the child; and, (7) the cumulative effect of certain errors committed at the trial level was to deny him a fair trial.

William Ford's first argument on appeal is that in determining custody of the two children the trial court abused its discretion in refusing to consider certain evidence of the mother's character and personality. He describes one example of how the trial court allegedly refused such evidence.

Section 602 of the Illinois Marriage and Dissolution of Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 602) lists factors to be considered in awarding custody. There must be some indication in the record that the trial court considered the listed factors. (*In re Custody of Melear* (1979), 76 Ill. App. 3d 706, 395 N.E.2d 208.) One of the factors which must be considered is the mental health of the parties. Ill. Rev. Stat. 1979, ch. 40, par. 602(a)(5).

Here, both parties were examined by a court-appointed psychiatrist. The psychiatrist, whose selection was agreed to by the parties, testified at trial concerning the parties' mental health. Further, counsel for William Ford cross-examined Mary at length concerning her mental health history.

The only incident referred to by William Ford in his brief to support his allegation that the trial court refused to consider relevant factors of the mother's character and personality was that the trial court terminated an inquiry into Mary Ford's relationship with her father. At the time of the questioning Mary Ford was 44 years old. Her father had been dead for 32 years. Mary Ford answered numerous questions concerning her relationship with her father. Counsel for William Ford asked her whether her father had hurt her, how he had hurt her emotionally, and in what ways he was unresponsive. Mary Ford answered these questions. Thereafter, counsel for William Ford then asked Mary Ford "is that all." She expounded on her previous answers. Counsel asked again "is that all." Mary Ford answered. Counsel asked whether there was anything else that the father had done or failed to do that hurt Mary Ford. Mary Ford answered. Finally, Mary Ford's counsel objected to the line of questioning and asked that it be terminated. The court terminated the questioning concerning Mary Ford's relationship with her father.

■■ The latitude allowed in the cross-examination of a witness rests largely in the discretion of the trial court and its ruling will not be disturbed on appeal absent a clear abuse of discretion resulting in manifest prejudice. (*People v. Lenard* (1979), 79 Ill. App. 3d 1046, 398 N.E.2d 1054; *People v. Hampton* (1977), 46 Ill. App. 3d 455, 360 N.E.2d 1333.) Here, William Ford's counsel was allowed to cross-examine Mary Ford at length on her relationship with her father, although he had died 32 years previously when she was 12 years old. Mary Ford and the court-appointed psychiatrist each testified at length on matters relating to her

mental health. Therefore, we do not believe the trial court abused its discretion in terminating the lengthy inquiry into Mary Ford's relationship with her father.

William Ford next argues that the trial court abused its discretion in considering that because of an injury he was unable to jump, run, hop, or play certain sports. He argues further that the trial court gave excessive negative consideration to his handicap.

■■ First, the Marriage Act requires the trial judge to consider the physical health of the parties in determining custody. (Ill. Rev. Stat. 1979, ch. 40, par. 602(a)(5).) It was not error therefore for the trial court to allow evidence that because of an injury to his ankles and hips William Ford was unable to run, jump, hop or play certain sports. Second, there is no evidence in the record that the trial court gave disproportionate weight to William Ford's physical disabilities. William Ford makes no citation to the record in arguing otherwise. We therefore conclude that the trial court did not abuse its discretion concerning the evidence of William Ford's health.

William Ford next argues that the trial court gave disproportionate weight to the testimony of the court appointed psychiatrist. Pursuant to section 604(b) of the Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 604(b)), an impartial psychiatrist was appointed by the court to interview the parties and the children and to make recommendations as to custody and visitation. Both parties agreed to the choice of psychiatrists. The psychiatrist was called as the court's witness. He stated that he examined both parties and the children on several occasions. He observed the parties individually and with the children.

The psychiatrist has practiced for 30 years. He has been teaching at Loyola Medical School and Loyola School of Social Work for 20 years, and has been the director of the psychiatric out-patient unit of St. Francis Hospital for 16 years. Prior to working at St. Francis Hospital, he was director of out-patient psychiatry at Mercy Hospital. Based upon his study of the parties and the children, the psychiatrist recommended that Mary Ford receive custody of both children.

William Ford's arguments are that the psychiatrist did not know the Fords prior to the litigation, was not a child psychiatrist, and made a recommendation that was contrary to that given by the children's pediatrician. We do not believe that these arguments support a reversal of the trial court's custody order.

■■ First, there is no evidence in the record as to the weight given by the trial court to the psychiatrist's testimony. Second, the psychiatrist was qualified, notwithstanding that he did not know the Fords prior to the litigation and was not a child psychiatrist. His lack of previous contact with the Fords was a function of the fact that he was an impartial

psychiatrist appointed by the court pursuant to section 604(b) of the Marriage Act. While the witness is not a child psychiatrist, his qualifications include 30 years of teaching and clinical experience. Further, the selection of the psychiatrist had been agreed to by the parties, and no objection was made to the psychiatrist's qualifications at the time he testified. That the children's pediatrician may have disagreed with the court-appointed psychiatrist does not in and of itself render the trial court's award of custody to the mother an abuse of discretion.

William Ford next contends that the trial court erred in permitting inquiry into and in considering his political beliefs. Specifically, he objects to an inquiry into a conversation which occurred between the parties when they first met. William Ford did not answer the question concerning the conversation and we therefore find no reversible error.

William Ford next argues that the trial court erred in allowing questioning about his religious affiliation. He was asked what religion he observed and answered that he was a Buddhist. His counsel objected to further questioning concerning his religious belief. The trial court overruled the objection, stating, "I think in a custody case all things are important regarding the physical and spiritual well-being of a child." Mary Ford was cross-examined on her religious beliefs over the objection of her counsel.

In each of the cases cited by William Ford, the reviewing court reversed child custody awards which were based solely or primarily on the religious beliefs of the parents. (*Osier v. Osier* (Me. 1980), 410 A.2 1027 (award of custody to father reversed because the mother's religious beliefs on blood transfusions were "plainly" the sole basis of the award); *Waites v. Waites* (Mo. 1978), 567 S.W.2d 326 (award of custody to father reversed where trial court focused primarily on the mother's religious belief rather than on children's best interest and where, excluding consideration of religion, children's best interests best served by award of custody to mother); *Bonjour v. Bonjour* (Alas. 1979), 592 P.2d 1233 (held constitutional State statute requiring consideration of children's religious needs in awarding custody, but reversed award of custody to father because religious belief of mother was the sole determinant in the trial court's decision although there was no showing of child's religious needs).) None of the cases cited supports the proposition that an inquiry into religious affiliation or training is in and of itself reversible error.

■■ As we read the record here, evidence of the parents' religious beliefs was admitted only as a means to gain insight into the entire family picture. Nowhere in the statements of the trial judge or in any action involved in the trial of this cause does it appear that the judge's decision was influenced or determined by the question of religion. We therefore conclude that the inquiry into William Ford's religious beliefs is not grounds for reversal of the trial court's custody award. See *Kjellesvik v.*

*Shannon* (1976), 41 Ill. App. 3d 674, 355 N.E.2d 120; *Wilner v. Wilner* (1971), 131 Ill. App. 2d 891, 266 N.E.2d 918.

William Ford next contends that the trial court exceeded the permissible scope of inquiry during an *in camera* interview with the parties' older child. He argues that section 604(a) of the Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 604(a)) limits the scope of such interviews to the determination by the court of the wishes of the children regarding their custody and visitation. The actual language of the statute is as follows:

> "The court may interview the child in chambers to ascertain the child's wishes as to his custodian and as to visitation. Counsel shall be present at the interview unless otherwise agreed upon by the parties. The court shall cause a court reporter to be present who shall make a complete record of the interview instantaneously to be part of the record in the case."

■■ We note initially that William Ford's counsel was present at and participated in the *in camera* conference. However, counsel made no objection to the scope of inquiry at that time. His objection therefore is waived for purposes of appeal. *Fohr v. Fohr* (1979), 75 Ill. App. 3d 575, 394 N.E.2d 87.

■■ Further, the statutory admonition to the trial court that the purpose of the interview is "to ascertain the child's wishes as to his custodian and as to visitation" does not limit the trial judge to questioning the child directly as to where he wishes to live and what visitation he would desire. As stated by the trial court in *Fohr*:

> "Factual situations are bound to vary widely as will the personalities of the children being interviewed. Basic to an intelligent election by a child would be an understanding of the necessity, background and basis for a decision. Before a judge can properly weigh an election he must satisfy himself that the child is making it while possessed of the understanding that his age, intelligence, knowledge and experience will permit him to assimilate. The court's obligation to determine such factors operates to expand the scope of the court's inquiry." *Fohr*, 75 Ill. App. 3d 575, 579, 394 N.E.2d 87, 90.

Here, the trial judge asked the child general questions about his school, friends, health, age, hobbies, and what he liked to do. The judge tried to ascertain whether the child knew the difference between right and wrong. Finally, the judge asked the child "what do you think ought to be done here today." The child did not know. After a short discussion about making paper spaceships, the judge concluded the interview. We do not believe the trial court abused its discretion in fixing the scope of inquiry during the *in camera* conference.

■■ William Ford also contends that it was error for the trial judge to state, as a reason for granting custody of both children to Mary Ford, that

it was desirable to have the children raised together. We do not believe that this statement constitutes reversible error. First, even if the trial court based its decision in part upon an improper ground, our function is to determine the correctness of the result, not of the reasoning. (*People ex rel. Rathbun v. Rathbun* (1977), 48 Ill. App. 3d 328, 362 N.E.2d 1136; *Kaufman v. Kaufman* (1974), 22 Ill. App. 3d 1045, 318 N.E.2d 282.) Second, while awarding custody of one child to the father and awarding custody of another child to the mother is sometimes warranted (*Rayburn v. Rayburn* (1977), 45 Ill. App. 3d 712, 360 N.E.2d 142), there is much to commend the keeping together of the siblings of the family in order to preserve what remains of the family (*In re Marriage of McCune* (1980), 86 Ill. App. 3d 311, 408 N.E.2d 319; *In re Marriage of Lovejoy* (1980), 84 Ill. App. 3d 53, 404 N.E.2d 1092; *Temple v. Temple* (1977), 52 Ill. App. 3d 851, 368 N.E.2d 192). Therefore, we do not believe it was reversible error for the trial court to state her belief that it was desirable to keep the children together.

William Ford's last argument concerning custody is that the record contains numerous errors, the cumulative effect of which is to prejudice the record and deny him a fair and impartial trial. He lists nearly 70 instances of alleged error. However, most of these allegations of error are merely references to the record. With five or six exceptions, William Ford does not state the legal basis of his claim of error. Whether viewed singly or cumulatively, the few instances for which legal support is offered do not constitute reversible error. For example, he objects to the introduction below of Mary Ford's financial statement but does not include that evidence in his record on appeal. He complains that several statements of fact made by Mary Ford's counsel during closing argument were false. However, the record shows that the allegedly false statements were either withdrawn voluntarily by Mary Ford's counsel or were stricken by the trial court. He complains of the court's unwillingness to interview the parties' older child, but the record shows that such an interview was conducted. Similarly, he complains that the court was reluctant to consider Mary Ford's pension fund, but the record shows that the pension fund records were introduced at trial and that the court considered them. Finally, William Ford complains that the trial court refused to enter into evidence a brochure about the Latin School and that the court stated "I know all about the school, so it won't go in." However, William Ford does not indicate in what way this alleged error is relevant to the issue of custody. We conclude that William Ford's references to the record and to alleged errors are not sufficient to constitute grounds for reversal. See also *Deckard v. Joiner* (1970), 44 Ill. 2d 412, 255 N.E.2d 900; *Thanopoulos v. Pickens* (1980), 87 Ill. App. 3d 906, 409 N.E.2d 477, concerning the adequacy of appellate briefs.

William Ford also argues that the trial court abused its discretion in

awarding only $400 to him as maintenance. He contends that the maintenance award should be reversed with directions to allow $8000 to $10,000 maintenance per year. The July 20, 1979, order appealed from provides in part "motion of respondent for maintenance from petitioner is allowed, and petitioner shall pay respondent maintenance of $100 per month for four months with same to be reviewed in four months. This matter is continued to November 15, 1979 at 11:00 a.m. for that purpose."

Thus, by the July 20 order the issue of maintenance was "reserved" for consideration at a later date, a dispositional alternative provided for by section 401(3) of the Marriage Act (Ill. Rev. Stat. 1979, ch. 40, par. 401(3)). Mary Ford was ordered to pay William Ford $100 per month until the November 15 hearing because, according to the trial court, William Ford was in "dire circumstances" and needed time to liquidate certain assets.

The order appealed from concerns an award of maintenance for the period between July and November 1979. However, the adequacy of that award is not disputed on appeal. The issue raised by William Ford is whether he is entitled to $8000 to $10,000 maintenance annually. Because this issue was not determined by the order appealed from but rather was expressly reserved by the trial court, it is not properly before us, and we do not consider it.

■■ William Ford's last argument on appeal is that the trial court erred in denying his request that Mary Ford pay his attorneys' fees. Attorneys' fees may not be granted in a divorce case absent a showing of the financial inability of one party to pay the fees and the ability of the other party to do so. *Christian v. Christian* (1979), 69 Ill. App. 3d 450, 387 N.E.2d 1254; *Kaufman v. Kaufman* (1974), 22 Ill. App. 3d 1045, 318 N.E.2d 282.

Here, William Ford's financial inability to pay his own attorneys' fees has not been established. There is nothing in the record stating the amount of the attorneys' fees. Also, from the record it appears that William Ford has assets from which to pay attorneys' fees. He contends that his income is presently $3500 per year and that his business liabilities are equal to or greater than his business assets. However, he testified that he owned real estate subject to a $14,000 mortgage which he had listed for sale at $75,000, that he owned a business and an art gallery, and that he owns art work valued at several thousand dollars. Because the record is incomplete concerning the amount of fees requested and because there is evidence that William Ford has assets from which to pay attorneys' fees, we affirm the trial court's order that each party pay his own fees.

For the foregoing reasons the judgment of the circuit court is affirmed.

Affirmed.

LINN, P. J., and ROMITI, J., concur.