*In re* MARRIAGE OF JUDITH ANN WYCOFF, Petitioner-Appellant, and KEVIN LEE WYCOFF, Respondent-Appellee.

Fourth District    No. 4—93—0984

Argued July 20, 1994.—Opinion filed August 15, 1994.

McCULLOUGH, P.J., specially concurring.
STEIGMANN, J., dissenting.

Gregory A. Scott (argued), of Scott & Scott, P.C., of Springfield, for appellant.

Robert B. Goldman (argued), of Springfield, for appellee.

JUSTICE COOK delivered the opinion of the court:

The trial court terminated joint custody, then terminated the primary physical custody of the mother and awarded sole custody to the father. We affirm the termination of joint custody but reverse the award of sole custody to the father. This case was argued before us on July 20, 1994. Because we reverse a custody award, all members of this panel have given this case priority over our other work.

Judith Ann Wycoff (now Anderson) and Kevin Lee Wycoff were married July 10, 1982. A child, Brittany, was born in December 1984. On May 22, 1987, a judgment was entered by the Sangamon County circuit court terminating the marriage. The judgment incorporated

the parties' agreement for joint custody, with Judith to have physical custody, and Kevin to have overnight visitation every other Friday and Saturday nights, as well as visitation Monday and Thursday evenings from 4 to 9 p.m. Visitation generally followed that schedule although Judith presented evidence Kevin often worked Monday or Thursday nights and on other visitation evenings sometimes played with his Christian rock band.

Kevin married Lisa Jostes on April 7, 1990. Judith married Ted Anderson, a resident of La Harpe, Illinois, on June 19, 1993. Before Judith's marriage Kevin filed a "Counter-petition for Modification of Judgment of Dissolution of Marriage," on April 12, 1993. The petition recited that there had been a substantial change in circumstances, that the parties were unable to resolve a dispute concerning Judith's decision to move from Sangamon County, that joint legal custody was no longer in Brittany's best interests, and requested that Kevin be awarded sole legal and physical custody. Judith filed her own petition to modify, asking that sole custody be awarded to her, on April 27. She then filed an "Emergency Petition to Modify Visitation Schedule" on May 7.

After hearing evidence for three days, the trial court, on June 16, 1993, denied the emergency petition to modify the visitation order, citing section 607(c) of the Illinois Marriage and Dissolution of Marriage Act (Act), which provides "the court shall not restrict a parent's visitation rights unless it finds that the visitation would endanger seriously the child's physical, mental, moral or emotional health." (750 ILCS 5/607(c) (West 1992).) The court then directed that the physical custody of Brittany be alternated each week between Kevin and Judith through August 18.

After five days of testimony in August, the trial court entered an order that clear and convincing evidence warranted termination of the award of joint custody, and that the best interests of the child warranted placing permanent custody with Kevin. The order noted that Brittany expressed a preference to live with Judith, "but has stated no reasons to this Court for her preference." The order did *not* mention that Brittany's guardian *ad litem* (GAL), who had spent a considerable amount of time with Brittany over the months of the hearing, had recommended that custody of Brittany be placed with Judith. Judith was ordered to pay child support of $300 per month. The court also directed that the GAL's fees of $8,119.09 be divided equally between the parties.

Stability for the child is a major consideration both with an initial award of custody under section 602 of the Act (750 ILCS 5/602 (West 1992)) and with a modification of custody under section 610 of the

Act (750 ILCS 5/610 (West 1992)). Some decisions suggest that "stability" is achieved when a child is moved from a home where there is turmoil to one where there is quiet. (See *In re Marriage of Pease* (1982), 106 Ill. App. 3d 617, 435 N.E.2d 1361; *In re Marriage of Apperson* (1991), 215 Ill. App. 3d 378, 384, 574 N.E.2d 1257, 1261.) "Stability" is also used in the sense of continuity, the absence of change. Some child development experts believe:

> "that interruption of a continuous relationship with a loving and nurturing parent invariably leaves scars that do not heal completely and may affect the child's future ability to form relationships and become a good parent himself. Such experts are likely to recommend that the child stay with the parent to whom he has the stronger attachment (if they can determine which parent that is), even though the other parent may be better off, more intelligent, more consistent, more patient, and generally more appealing." (S. Goldstein & A. Solnit, Divorce & Your Child 66 (1984) (hereinafter Goldstein).)

It is a mistake to change custody from a good custodian in hopes that another may be better.

The policy favoring stability finds its strongest expression in cases involving attempts to modify a previously made custody decision, under section 610 of the Act. By creating a presumption in favor of the present custodian, the legislature in section 610 has sought to promote a stability and continuity in the child's custodial and environmental relationships which is not to be lightly overturned. (*In re Custody of Harne* (1979), 77 Ill. 2d 414, 421, 396 N.E.2d 499, 502.) " '[I]nsuring the decree's finality is more important than determining which parent should be the custodian.' " *Harne*, 77 Ill. 2d at 420, 396 N.E.2d at 501-02, quoting Uniform Marriage and Divorce Act, 9A U.L.A. § 409, Commissioners' Note (1973).

Development of the concept of joint custody has raised some questions about the policies of section 610, and how joint custody orders should be modified or terminated. The emphasized language below was added to section 610(b) of the Act when the original, limited, version of joint custody was enacted in 1982 (see Pub. Act 82—1002, § 2, eff. September 17, 1982 (1982 Ill. Laws 2609, 2616)):

> "The court shall not modify a prior custody judgment unless it finds by clear and convincing evidence, upon the basis of facts that have arisen since the prior judgment or that were unknown to the court at the time of entry of the prior judgment, that a change has occurred in the circumstances of the child or his custodian, *or in the case of a joint custody arrangement that a change has occurred in the circumstances of the child or either or both parties having custody* [(the change clause)], and that the

modification is necessary to serve the best interest of the child. *In the case of joint custody, if the parties agree to a termination of a joint custody arrangement, the court shall so terminate the joint custody and make any modification which is in the child's best interest* [(the agreement clause)]. The court shall state in its decision specific findings of fact in support of its modification or termination of joint custody if either parent opposes the modification or termination." (Emphasis added.) (750 ILCS 5/610(b) (West 1992).)

The final sentence in the section was added when the provisions for joint custody were broadened, effective January 1, 1986. See Pub. Act 84—795, eff. January 1, 1986 (1985 Ill. Laws 4853).

Confusion over the application of section 610 to joint custody orders arises from the failure to distinguish two separate questions: (1) whether the joint custody arrangement should be replaced by a sole custody arrangement, and (2) whether custody should be changed from the primary physical custodian.

It could be argued that when joint custody is terminated the court starts over in determining the best interest of the child, and ignores the period of time the child has spent with the party having physical custody under the joint custody order. That argument has been rejected. In *In re Marriage of Kartholl* (1986), 143 Ill. App. 3d 228, 233, 492 N.E.2d 1006, 1009, a case similar to this one, the appellate court held the legislative presumption of section 610 in favor of the present custodian applied to the primary physical custodian in a joint custody case. Other courts have agreed. The "physical custodian[ ] is entitled to the benefit of the presumption favoring the existing custodial arrangement which should not be lightly overturned." (*In re Marriage of Good* (1991), 208 Ill. App. 3d 775, 778, 566 N.E.2d 1001, 1003.) A petition to change the primary custodian of the child, though not a petition to revoke joint custody, is a modification governed by section 610 of the Act. (*In re Marriage of Noble* (1989), 192 Ill. App. 3d 501, 506, 548 N.E.2d 518, 520; *In re Marriage of Oros* (1994), 256 Ill. App. 3d 167, 168, 627 N.E.2d 1246, 1247-48.) There may be some joint custody cases where there is no primary physical custodian, where the child spends approximately equal time with each parent, but such cases are unusual. See *Oros*, 256 Ill. App. 3d at 170, 627 N.E.2d at 1249 (alternating custody orders undesirable).

Kevin argues that in other cases the court refused to give any preference to the primary physical custodian after a joint custody arrangement was terminated. Although our decision in *Apperson* was made under section 602 of the Act, we did not there discuss the issue

considered here, and sole custody was in fact awarded the former primary physical custodian. (*Apperson*, 215 Ill. App. 3d at 384, 574 N.E.2d at 1261.) The issue was also not discussed in *Prince v. Herrera* (1994), 261 Ill. App. 3d 606, 633 N.E.2d 970. *In re Marriage of England* (1987), 158 Ill. App. 3d 1005, 1010, 512 N.E.2d 95, 98, is difficult to reconcile with our decision here, but in *England* this court recognized a close question was involved, it appears there was no primary physical custodian, and rightly or wrongly this court refused to give any weight to an agreed order of temporary custody and chose to affirm the decision of the trial court.

The *Kartholl* court held the trial court erred, after refusing to terminate the mother's physical custody, when it went on to terminate joint custody and place sole custody in the mother. The legislative presumption of section 610 was held to apply, not just to the change of the primary custodian, but to the termination of the joint custody arrangement itself. On this second point we disagree with the *Kartholl* court. If it is accepted that joint custody can only succeed where the parents have an ability "to cooperate effectively and consistently with each other towards the best interest of the child" (750 ILCS 5/602.1(c)(1) (West 1992)), then joint custody should be readily terminated when such cooperation no longer exists. (See *Oros*, 256 Ill. App. 3d at 170, 627 N.E.2d at 1249; *In re Marriage of Drummond* (1987), 156 Ill. App. 3d 672, 679-80, 509 N.E.2d 707, 713.) In our view, what we have referred to as the change clause allows a trial court to terminate the joint custody arrangement (but not necessarily the custody of the primary physical custodian) whenever it has become apparent that the parents cannot cooperate in the best interest of the child.

Kevin argues that the agreement clause controls the change clause in cases where both apply: if joint custody is terminated by agreement, the court must then award custody on the basis of the child's best interest, without giving any weight to the fact that one parent has been the primary physical custodian. We reject that argument. The agreement clause allows joint custody to be terminated in cases where the parents recognize it is not working, without the necessity of convincing the court that the parents cannot cooperate, or that the child is being adversely affected. Even where the joint custody arrangement is terminated by agreement, however, there is no justification for ignoring the bond which has developed between the child and the primary physical custodian, whether the case is decided under the presumption favoring the present custodian of section 610 or as an initial award of custody based on the best interest of the child under section 602 of the Act. Stability and conti-

nuity are in the best interest of the child under section 602, and the presumption of section 610 is but a specific recognition of that fact.

In *Kartholl* the court conceded the relationship between mother and father was "strained," although there was no testimony the dispute adversely affected the child. The court nevertheless concluded it could not terminate the joint custody arrangement in the absence of clear and convincing evidence under section 610 of the Act, but went on to suggest that joint custody could be terminated if the parties so agreed, noting the agreement clause. The court in *In re Marriage of Lovejoy* (1987), 158 Ill. App. 3d 1, 510 N.E.2d 636, went further to hold that cross-petitions for sole custody amount to an agreement to terminate joint custody. (*Lovejoy*, 158 Ill. App. 3d at 3, 510 N.E.2d at 637 (clear and convincing evidence warranted a change in the primary physical custodian as well).) Subsequent cases have refused to follow *Lovejoy* on this point, on the basis that a new joint custody statute was enacted in 1986, one more supportive of the concept of joint custody, and that the agreement clause must be considered implicitly repealed. (*In re Marriage of Burke* (1989), 185 Ill. App. 3d 253, 259, 541 N.E.2d 245, 249; *Good*, 208 Ill. App. 3d at 777, 566 N.E.2d at 1002.) The legislature in fact changed section 610 when it enacted the new joint custody statute in 1986, but apparently chose not to eliminate the agreement clause. Instead the legislature directed the court to make specific findings "if either parent opposes the modification or termination" (emphasis omitted) language, which indicates the legislature still believed that joint custody could be terminated by agreement. (Pub. Act 84—795, eff. January 1, 1986 (1985 Ill. Laws 4853).) It has been five years since *Burke* was decided, and the legislature has not yet removed the language from section 610 that *Burke* suggested was impliedly repealed.

We do not disagree with the trial court's decision to terminate the joint custody arrangement in this case. It is difficult, however, to understand why Kevin was made the sole custodian in place of Judith. Judith had been the primary physical custodian for more than six years, ever since the marriage of the parties was dissolved. Brittany testified *in camera* that she preferred to live with her mother. Brittany's guardian *ad litem* recommended that the custody of Brittany remain with Judith. The only thing that can be said in support of the trial court's decision is that it strengthened the relationship between Brittany and Kevin and his family, and that it kept Brittany in the Springfield area where she had been raised. Choosing either parent, however, would have the effect of strengthening that relationship (as well as the effect of weakening the relationship with the other parent and family). Keeping a child in the Springfield area

is not as important as maintaining the child's relationship with her present physical custodian. Whether the custody decision is considered under section 602 or 610 of the Act, the trial court's decision to change custody from Judith was an abuse of discretion.

There is usually a difference between sections 602 and 610 in deciding these cases. In section 602 cases the child has often spent most of his life with both parents, neither has any advantage over the other, and the trial court cannot make a mistake wherever custody is placed. (See *Prince*, 261 Ill. App. 3d at 612, 633 N.E.2d at 976.) Under section 610 there is a strong presumption in favor of the present custodian. However, stability and continuity, "the *** interrelationship of the child with his parent" (750 ILCS 5/602(a)(3) (West 1992)), is also a factor under section 602. In some cases under section 602 the child may have spent a majority of his time with one of his parents, for example where there is a period of separation before the petition for dissolution is filed, or where there is a lengthy period of temporary custody before the final award. It is proper for the court to consider who has been the primary caretaker of the child during the marriage. (See *In re Custody of Switalla* (1980), 87 Ill. App. 3d 168, 174, 408 N.E.2d 1139, 1144.) Even where temporary orders and delays in the process of litigation account for the time during which a child remains with a particular parent, the effect on the child is the same regardless of the source of the delay. 2 H. Clark, The Law of Domestic Relations in the United States § 20.6, at 535 (2d ed. 1987) (hereinafter Clark); see also *In re Marriage of Sechrest* (1990), 202 Ill. App. 3d 865, 874, 560 N.E.2d 1212, 1217; *cf. England*, 158 Ill. App. 3d at 1010, 512 N.E.2d at 98 (agreed temporary physical custody should not rise by its own bootstraps).

The trial court gave little weight, perhaps no weight, to Brittany's preference to live with Judith because Brittany "stated no reasons to this Court for her preference." While it has been said that a child's preference as to custody should only be given weight when it is based on sound reasoning (*Shoff v. Shoff* (1989), 179 Ill. App. 3d 178, 185, 534 N.E.2d 462, 467), the statute does not require the child to give a good reason for his preference. (750 ILCS 5/602(a)(2) (West 1992).) A court may find that the child's preference is not in his best interest (*Shoff*, 179 Ill. App. 3d at 185, 534 N.E.2d at 467), and a preference for a parent because he lets the child watch television or skip homework should not be given much weight. Courts must be alert for situations where parents have attempted to influence the statements made by the child. (See *Apperson*, 215 Ill. App. 3d at 381, 574 N.E.2d at 1259.) However, where the child indicates a stronger attachment to one parent, that attachment should be respected, even though the

child has not given a good reason for it. It was not necessary for Brittany to quote Goldstein and Solnit that "interruption of a continuous relationship with a loving and nurturing parent invariably leaves scars." (Goldstein, at 66.) Children sometimes understand what is a good reason better than do the courts. In *In re Custody of Krause* (1982), 111 Ill. App. 3d 604, 607, 444 N.E.2d 644, 647, the court was critical that a child was only "expressing a preference for his life to continue as it had been." Of course that is the basis for section 610's presumption in favor of the present custodian.

Requiring specific reasons for a child's preference runs counter to the idea that courts should be careful in conducting *in camera* interviews. "It is seldom in a child's interest to be asked to choose between his parents or to believe that his expression of preference will influence the judge's decision." (Goldstein, at 67.) Children are often smart enough not to complain about either parent during an *in camera* interview. For their part, most judges try to reassure the child that the judge will be deciding the issue of custody and not the child. Most judges do not ask the child directly where he wishes to live and what visitation he would desire. (See *In re Marriage of Ford* (1980), 91 Ill. App. 3d 1066, 1071, 415 N.E.2d 546, 550-51; *In re Marriage of Balzell* (1991), 207 Ill. App. 3d 310, 314, 566 N.E.2d 20, 22.) The trial court here should have given some weight to Brittany's expressed preference, in the absence of any showing the preference was coerced or based on improper reasons.

Kevin argues that the trial court properly refused to consider the recommendation of the GAL on the basis of *In re Marriage of Pool* (1983), 118 Ill. App. 3d 1035, 1040, 455 N.E.2d 887, 891, where it was said that the recommendation of a GAL "was clearly the personal opinion of the attorney, and it is error to inject personal opinions into closing arguments." For this statement *Pool* relied on a case which did not involve a GAL, a case where a plaintiff's attorney in a tort action expressed his opinion in closing argument. (*Robinson v. Wieboldt Stores, Inc.* (1982), 104 Ill. App. 3d 1021, 1027, 433 N.E.2d 1005, 1010.) Other cases have allowed a GAL to make a custody recommendation. (*In re Marriage of Smith* (1983), 114 Ill. App. 3d 47, 49-50, 448 N.E.2d 545, 547; *Apperson*, 215 Ill. App. 3d at 382, 574 N.E.2d at 1259; see also *In re Marriage of Stuckert* (1985), 138 Ill. App. 3d 788, 791, 486 N.E.2d 395, 396-97 (trial court allowed witnesses' hearsay evidence of child's preference to live with father).) To the extent that it holds that a GAL may not make a recommendation as to custody, *Pool* is overruled.

A GAL acts under the control and direction of the court as the child's representative. A GAL is the "eyes and ears" of the court.

(Chambers, *The Ambiguous Role of the Lawyer Representing the Minor in Domestic Relations Litigation*, 70 Ill. B.J. 510, 511 (1982).) In our view it is proper for the GAL to make the child's preference known to the court, and the court should have given some weight to the GAL's recommendation here. Another way to get a child's preference before the court is through the admission of hearsay statements made by the child. See *Stuckert*, 138 Ill. App. 3d at 791, 486 N.E.2d at 396-97; *In re Marriage of Gustafson* (1989), 187 Ill. App. 3d 551, 556, 543 N.E.2d 575, 578; *In re Marriage of Deckard* (1993), 246 Ill. App. 3d 427, 431, 615 N.E.2d 1327, 1331; see also 750 ILCS 5/604(b) (West 1992) (court may seek advice of professional personnel); 750 ILCS 5/605(b) (West 1992) (investigator may consult with any person who may have information about the child).

The course taken by the trial court in this case may have been set when it denied Judith's petition to modify visitation on the basis of section 607(c) of the Act. To avoid restricting Kevin's visitation in this case, the trial court ended up changing primary physical custody from Judith, an example of the tail wagging the dog. Not every change or even reduction in visitation time constitutes a "restriction of visitation." A termination of visitation is a restriction, as is a prohibition on overnight visitation. A requirement that visitation be supervised, occur in the home of the custodial parent, or outside the home of the noncustodial parent is a restriction. However, a reduction of weekend visitation from 50 hours to 31, and reduction of summer visitation from four weeks to two weeks (because of the children's activities), is not a restriction which had to meet the serious endangerment standard. (*Gibson v. Barton* (1983), 118 Ill. App. 3d 576, 579-80, 455 N.E.2d 282, 284-85; *In re Marriage of Lee* (1993), 246 Ill. App. 3d 628, 645, 615 N.E.2d 1314, 1327; *In re Marriage of La-Tour* (1993), 241 Ill. App. 3d 500, 504, 608 N.E.2d 1339, 1343.) The trial court could have changed visitation in this case to accommodate Judith's move to La Harpe, without violating section 607(c).

The trial court seems to have been critical of Judith for remarrying and moving to La Harpe. Similar issues frequently arise in cases where there is a petition for leave to remove a child from the State under section 609 of the Act. (750 ILCS 5/609 (West 1992).) It is not necessary for a custodial parent, or a parent with the primary physical custody of a child, to obtain permission from a court before moving to another location in Illinois. In any event, "[c]ustodial parents should not be expected to give up careers for the sake of remaining in the same geographical location." (*Good*, 208 Ill. App. 3d at 778, 566 N.E.2d at 1003; see also *In re Marriage of Deckard* (1993), 246 Ill. App. 3d 427, 434, 615 N.E.2d 1327, 1333.) Judith cannot be

criticized for her decision to remarry and move to La Harpe, in the absence of any showing that she did so in an attempt to frustrate visitation or interfere with the relationship between Kevin and Brittany.

One of the advantages to section 610's presumption in favor of the present custodian is that it eliminates the need for courts to hear voluminous testimony in order to determine which parent is the best parent. Even in initial custody cases, however, courts are not obliged to allow each parent to call every possible witness who will testify that he or she gets along well with the child. A court has considerable power to exclude evidence which is merely cumulative (M. Graham, Cleary & Graham's Handbook of Illinois Evidence § 403.1 (5th ed. 1990)), including limiting the number of witnesses each party may call. There was no real disputed issue of fact in this case. As anticipated, the trial court concluded that both parents were fit and proper custodians, and both La Harpe and Springfield were appropriate places to raise a child. Five days (or eight days) of testimony from witnesses who could say only that each party was a good parent, or offer an opinion favoring the parent they were familiar with, was a waste of judicial resources and the parties' assets. It is possible that such a lengthy hearing has made relations between the parties more difficult, and been a source of anxiety to Brittany as well.

We are similarly concerned about the wisdom of a GAL in this case. Kevin moved for appointment of a GAL because "the parties have Joint Custody and the Plaintiff is remarrying and moving from Central Illinois." In most cases the child's interests are adequately protected by one or the other parent, or by the court, and it is difficult to see how the presence of another lawyer could improve the process enough to be worth the cost. (Clark, § 20.3, at 492-93.) Although a GAL may be useful in communicating a child's needs and wishes to the court, there was no reason for a GAL to sit through the lengthy hearings in this case.

In summary, the trial court properly terminated joint custody both because of the inability of the parties to cooperate effectively toward the best interest of the child and because of the agreement of the parties for termination, manifested by their cross-petitions for sole custody. We reverse the award of sole custody to Kevin because the evidence in this case did not overcome the strong preference in favor of the primary physical custodian established by section 610 of the Act. In the alternative, we reverse the award of sole custody under section 602 of the Act as an abuse of discretion, because of the overwhelming evidence favoring continuation of custody with the primary physical custodian in the best interests of the child. We

remand for entry of an order awarding sole custody to Judith and for a new order of child support.

Affirmed in part, reversed in part, and remanded.

JUSTICE McCULLOUGH, specially concurring:

First, I point out the respondent's brief cites only one case in support of the trial court's order, *Kartholl*. Other than referring to petitioner's brief, the respondent's argument cites no authority other than *Kartholl* and does not refer to any pages of the record that are relied upon. Likewise, there is no reference or supplement to petitioner's statement of facts and citations to the record. Only after questioning by this court concerning the inadequacy of the brief and both parties' reference to cases not cited, leave was granted to file supplemental authority.

To summarize the testimony of the parties, Kevin's mother testified only to the benefits of visiting with Brittany. Kevin's sister-in-law, Wendy Mundhenke, testified to Brittany's good relationship with Kevin's family members and that Brittany would miss the spontaneous activities of family get-togethers. Kevin's mother-in-law also testified as to the relationship of the family members with Brittany. The testimony in behalf of Kevin spelled out the happy times of the family with Brittany. It is apparent that had Judith not planned to move to La Harpe, everyone would have continued in the same mold, joint custody, primary physical custody with Judith and visitation with Kevin.

The testimony on behalf of Kevin also acknowledges that visitation was as much with other members of the family as with him. Overall, the evidence presented by Kevin appears to be what is best for the individual witness, not what is best for Brittany.

There was no evidence by Kevin that the move to La Harpe was harmful to Brittany. Kevin and Lisa (his present wife) had no concerns about Brittany's living arrangements in La Harpe.

Judith's evidence dealt more with Brittany. She was active in Brittany's interests, games, reading, vacations, and a summer reading program. She was involved with Brittany's school activities and attended parent-teacher conferences. Brittany has become actively involved in activities in La Harpe. Judith was the primary caretaker as far as medical and dental decisions.

Whether the provisions of section 610 or section 602 of the Act are followed, it is clear the best interests of Brittany are served by placing custody with Judith. Per section 610, the only change in circumstances of the child, or either or both parties having custody, is the move of Judith from Springfield to La Harpe.

I disagree with my colleague as to the wisdom of appointing a GAL for the child. The GAL represents the child and is able to interview the child, know her feelings, cross-examine all witnesses to determine their sincerity and make a recommendation to the trial court custody.

In this case, considering the evidence presented, Judith's primary custody of Brittany from 1987 until the trial court's order, of June 26, 1993, Brittany's expressed desire, and the recommendation of the GAL, clearly shows the trial court's decision was against the manifest weight of the evidence and an abuse of discretion.

JUSTICE STEIGMANN, dissenting:

Although I agree with much of the majority opinion, particularly its overruling this court's *Pool* decision, I respectfully dissent. While the case for designating Kevin the custodial parent is far from overwhelming, I am satisfied that the record contains sufficient evidence to support that decision on appeal.

The majority reverses the trial court's *factual determination* that Kevin would be the better custodial parent even though the trial court so ruled after conducting a five-day hearing at which dozens of witnesses testified. Deciding who should be the custodial parent after a divorce is frequently very difficult, and never does the trial court possess a greater advantage over this court than when it decides that issue. The trial court can detect nuances and subtleties as it evaluates the witnesses and prospective custodial parents. We cannot. Yet these ephemeral factors may legitimately play an important role as the trial court exercises its discretion and judgment.

This case also reveals the morass that frequently arises out of the misguided practice of awarding joint custody. Despite the effort of those who endorse joint custody, this fundamental rule of physics still applies: no one (including a child) can be in two different places at the same time. Thus, the term "joint custody" is really an oxymoron that somehow has obtained legislative approval. However, this legislative recognition does not change the reality that true joint custody cannot exist, any more than legislative recognition of "being a little bit pregnant" would render that condition feasible.

As a result of the problems created by the illogic of joint custody, we see in this case, and others, a concept developing that has no legislative recognition: the notion of "the primary physical custodian." Thus, the majority writes that "[e]ven where the joint custody arrangement is terminated by agreement, however, there is no justification for ignoring the bond which has developed between the child and the *primary physical custodian*." (Emphasis added.) (266 Ill. App. 3d at 412.) The Illinois General Assembly has not statutorily

recognized the status of "primary physical custodian," and there would be no need for courts to do so if the fiction of joint custody were abandoned.

I disagree with the majority's statement that "[t]he trial court here should have given some weight to Brittany's expressed preference [for her mother to be the custodial parent], in the absence of any showing the preference was coerced or based on improper reasons." (266 Ill. App. 3d at 415.) This statement is not fair to the trial court; merely because it chose not to follow Brittany's preference—and in doing so reached a result with which this court disagrees—does not mean the trial court failed to give any weight to that preference.

In marital and other cases, this court constantly hears from aggrieved appellants that the trial court *failed to consider* some appropriate factor in reaching its decision when, in fact, the trial court considered that factor but found that other factors outweighed it. The position of these aggrieved appellants is essentially that the trial court could not have given any weight to a particular factor favoring them because, if the court had done so, the appellant would have won. Even though this argument is nonsensical, statements like that of the majority here, implying that the trial court gave no weight whatsoever to Brittany's expressed preference, give succor to such arguments.

Last, this case also supports the position that not only is it unnecessary and unwise for the trial judge to interview the child of divorcing parents to determine her custodial preference, but it frequently amounts to nothing short of judicial child abuse. The parents are divorcing each other, but neither will (nor should) be divorcing the child. Thus, the trial court should do everything possible to strengthen and nurture strained relationships between the child and each of her parents during the traumatic process of divorce. Forcing a child to state a preference makes no sense, and judges who engage in this harmful practice should stop.

Further, the preferences of a nine-year-old, as in this case, conveyed under strained circumstances, are not necessary for the trial court to make its custodial determination. As the majority states—and I agree—trial courts should utilize GALs if they wish to have the benefit of a neutral, informed opinion on the subject of custody. The GAL in turn can state his or her recommendations to the trial court, in that the GAL's interview with his or her client should help form that recommendation. Obviously, however, that interview will occur under far less strained circumstances than when the child reveals her preference to a judge.

I respectfully dissent.