NO. 4-95-0623

                          IN THE APPELLATE COURT

                                OF ILLINOIS

                              FOURTH DISTRICT

THE ILLINOIS DEPARTMENT OF PUBLIC AID,   )   Appeal from

ex rel. KILEY GAGNON-DIX, a Minor, by    )   Circuit Court of

DEBRA DIX,                               )   Sangamon County

          Petitioner,                    )   No. 87F110

DEBRA DIX,                               )

          Petitioner-Appellant,          )   

          v.                             )

CHARLES GAGNON,                          )   Honorable

          Respondent-Appellee.           )   George H. Ray,

                                         )   Judge Presiding.

_______________________________________________________________

                                     

          JUSTICE COOK delivered the opinion of the court:

          In March 1994, the Illinois Department of Public Aid

(Department) filed a petition to determine paternity on behalf of

Kiley Gagnon-Dix, a minor, by Debra Dix, her mother.  Paternity

was subsequently established by a blood test.  In January 1995,

respondent Charles Gagnon admitted paternity, and in February

1995, he filed a petition for visitation, which was granted by

the trial court in June 1995.  Later that month, petitioner Debra

Dix moved to reopen, stay visitation, and appoint a guardian ad

litem (GAL).  The trial court granted the motions.  A GAL was ap-

pointed and interviewed Kiley, Dix, and Gagnon.  After consid-

ering the GAL's report, the trial court again granted respondent

visitation.  Petitioner Dix appeals, maintaining the trial

court's ruling was against the manifest weight of the evidence

and the court erred in not appointing a GAL at the outset of the

case.  Her motion for an emergency stay was denied.  The Depart-

ment was involved in trial court proceedings to determine pater-

nity and establish child support but is not party to this appeal. 

We affirm.

                              I.  BACKGROUND

          Kiley was born to Dix on November 6, 1986.  Dix noti-

fied Gagnon of her pregnancy.  He was then in the United States

Marine Corps stationed at Camp Le Jeune, North Carolina.   She

also notified him of Kiley's birth.

          On January 29, 1987, Dix filed a petition for support

in this case under the Revised Uniform Reciprocal Enforcement of

Support Act (URESA) (Ill. Rev. Stat. 1985, ch. 40, par. 1201 et

seq.) against Gagnon, which the circuit court transferred to

North Carolina.  On October 19, 1989, the superior court of Oslow

County, North Carolina, dismissed the action without prejudice as

Gagnon had been discharged from the Marine Corps and moved to

Springfield, Illinois.  

          On April 2, 1990, Gagnon stated through his attorney

(by letter referencing this case number) that, in the event he

were determined to be Kiley's father, he was prepared to do "the

right thing."  The letter noted statutory child support was $120

per month, stated he would exercise regular visitation, set out a

proposed visitation schedule and asked to hear from Dix within 10

days.

          On March 24, 1994, the Department filed a petition to

determine the existence of a father-and-child relationship. 

Blood tests were ordered.  Following the results of the tests, on

February 15, 1995, the trial court entered an agreed order of

parentage.

          On February 24, 1995, Gagnon filed a petition for visi-

tation.  Since the time of Kiley's birth, Gagnon had not had

contact with her.  After hearing evidence on March 17, the trial

court granted visitation by order of June 9, 1995.

          On June 21, 1995, Dix moved to stay visitation, reopen

the case, and appoint a GAL.  A GAL was appointed and, in her

July 1995 report, recommended that visitation be granted.  On

July 13, 1995, the trial court conducted another evidentiary

hearing and in camera interview.  On July 28, 1995, the trial

judge, after considering the GAL's report and determining that

visitation would be in the best interest of Kiley, ordered visi-

tation.  Dix appeals.

                               II.  ANALYSIS

          Gagnon did not file a brief in this appeal.  The stan-

dard of review in such instances is governed by First Capitol

Mortgage Corp. v. Talandis Construction Corp., 63 Ill. 2d 128,

345 N.E.2d 493 (1976).  Under Talandis, "if the record is simple

and the claimed errors are such that the court can easily decide

them without the aid of an appellee's brief, the court of review

should decide the merits of the appeal."  Talandis, 63 Ill. 2d at

133, 345 N.E.2d at 495.  We choose to decide this case on the

merits.

          First, Dix argues that the trial court's ruling was

against the manifest weight of the evidence.  We disagree.

          The GAL's report recommended visitation.  It noted

that, while Kiley stated she did not want to meet her father, her

reasons for this position were not clearly stated and appeared to

be a mixture of her feelings and those of her mother.  The GAL

found Kiley had definite apprehension in meeting Gagnon.  On the

other hand, at one point Kiley stated it "might be fun" to know

her father "if he was strong" and could give her piggyback rides

to bed.

          The GAL also found that Gagnon appeared to truly want

to start a relationship with his daughter and undertook steps to

ease her transition.  The report noted he had a bedroom for Kiley

and intended to enlist the aid of his sisters to decorate it in

an appropriate fashion.  The GAL was also impressed by his state-

ment that he had arranged for his young niece to come to Spring-

field from Chicago to meet Kiley the first weekend the visitation

had been scheduled.

          The GAL noted that, while Dix's protectiveness toward

her daughter was natural, her bitterness toward Gagnon was in-

fluencing Kiley.  The GAL concluded Kiley certainly had room for

another adult figure in her life and recommended gradual visita-

tion.

          At the July 1995 hearing on the visitation petition,

Dix testified she told Kiley on March 19, 1995, that she had a

father (but not his name):  "After telling her, I just told her

that she probably will have to meet him.  Hopefully we could

avoid that, but there was only so much that I could do."  Both

Dix and Kiley shed tears in this discussion, and Dix had talked

to Kiley about it two or three times a week since.  Dix prepared

Kiley for the in camera interview:  "I told her it was a very

serious thing and what she decided and what she said would affect

her future"; "I told her she needed to say how she felt."  The

child, age eight, indicated she did not want to see her father.

          The fact that DCFS has obtained an order establishing

paternity and setting child support does not mean that the father

is automatically entitled to visitation, especially in a case

like this, where the child is eight years old.  The Illinois Par-

entage Act of 1984 (Parentage Act) provides that, if a judgment

of parentage contains provisions for visitation, the court shall

determine visitation: 

          "in accordance with the relevant factors set 

          forth in the Illinois Marriage and Dissolution 

          of Marriage Act [(Marriage Act)] and any other 

          applicable law of Illinois, to guide the court 

          in a finding in the best interests of the child.  

          In determining custody, joint custody, or visita-

          tion, the court shall apply the relevant standards 

          of the [Marriage Act]."  (Emphasis added.)  

          750 ILCS 45/14(a)(1) (West 1994).  

We reject the view that the Parentage Act thereby incorporates

section 607(a) of the Marriage Act, requiring a court to award

visitation to a noncustodial parent unless the court finds, after

a hearing, that visitation "would endanger seriously the child's

physical, mental, moral or emotional health."  750 ILCS 5/607(a)

(West 1994).  The endangerment standard is an onerous one.  In re

Marriage of Hanson, 112 Ill. App. 3d 564, 568, 445 N.E.2d 912,

915 (1983) (a dissolution of marriage case).  

          The reference in section 14(a)(1) of the Parentage Act

to the factors set forth in the Marriage Act to determine the

best interest of the child is a reference to section 602 of the

Marriage Act (750 ILCS 5/602 (West 1994)), not to section 607 of

the Marriage Act (750 ILCS 5/607 (West 1994)).  The section

14(a)(1) reference to "relevant standards" makes it clear that

not every rule a court would apply to a parent in a dissolution

of marriage case applies with equal force to a parent in a par-

entage case.  (Emphasis added.)  750 ILCS 45/14(a)(1) (West

1994).  There is no presumption that it is in the best interest

of a child to have visitation with a biological father who has

had nothing to do with the child for eight years.  In fact, the

parental rights of an unmarried father may be terminated where he

does not seek to establish paternity or pay birth expenses or

provide support.  750 ILCS 50/1(D)(n)(2) (West 1994) (definition

of "unfit person").  It would be inconsistent to legislatively

mandate visitation for a biological father whose parental rights

could be terminated if a petition seeking that relief were filed.

          We hold the burden of proof in these cases is on the

noncustodial parent seeking visitation.  A request for visitation

might in some cases be a vindictive response to a request for

child support, and the noncustodial parent's goal might not be

the development of a relationship with the child, but the annoy-

ance of the custodial parent.  Where the court determines that

the noncustodial parent has a genuine interest in the child, how-

ever, the benefits of some sort of visitation may outweigh any

accompanying disruption.  The court has discretion to grant or

deny requests for visitation in Parentage Act cases based on its

determination of the child's best interest.  The record here

provides a basis for awarding visitation.  The trial court's

ruling was not against the manifest weight of the evidence.

          The case law cited by Dix is inapposite.  In Weybright

v. Puckett, 262 Ill. App. 3d 605, 635 N.E.2d 119 (1994), this

court affirmed the trial court's denial of visitation to a pater-

nal grandmother on the basis that visitation was not in the best

interest of the child.  We note that we affirmed the trial

court's exercise of discretion in Weybright, as we do here.  

Weybright is further not analogous, because it involved a deter-

mination of the rights of a grandparent, rather than a parent. 

We have noted that "[g]randparents *** do not step into their ***

children's shoes in regard to visitation" under the Marriage Act

(750 ILCS 5/101 et seq. (West 1992)).  Weybright, 262 Ill. App.

3d at 608, 635 N.E.2d at 121.  Grandparents' rights do not equate

with those of parents, because parents have responsibilities

toward their children that do not burden grandparents. 

Weybright, 262 Ill. App. 3d at 608, 635 N.E.2d at 121-22.

          Dix is correct when she points out that Kiley's pref-

erence should not be overlooked (although she is incorrect in

stating it is a primary factor).  Frail v. Frail, 54 Ill. App. 3d

1013, 1016, 370 N.E.2d 303, 305 (1977).  It was not overlooked.  

As it was made clear in the GAL's report, Kiley's preference was

difficult to discern:  on the one hand, she experienced an under-

standable apprehension; on the other hand, she was looking for-

ward to meeting Gagnon.  The trial judge, after interviewing

Kiley in camera, concluded that visitation would be in her best

interest.  This ruling was not against the manifest weight of the

evidence.  We have reviewed the other cases cited by Dix (Gri-

ffiths v. Griffiths, 127 Ill. App. 3d 126, 468 N.E.2d 482 (1984);

In re Custody of Horbatenko, 176 Ill. App. 3d 970, 531 N.E.2d

1011 (1988); LeHew v. Mellyn, 131 Ill. App. 3d 314, 475 N.E.2d

913 (1985); People ex rel. Vallera v. Rivera, 39 Ill. App. 3d

775, 351 N.E.2d 391 (1976); In re Custody of D.A., 201 Ill. App.

3d 810, 558 N.E.2d 1355 (1990)), and they do not require a con-

trary result.  In D.A., for example, petitioner sought a finding

of paternity (perhaps to bring a lawsuit for the death of the

mother in a Chicago Transit Authority accident) in preference to

respondent with whom the child had a parent-child relationship. 

There is no similar effort to supplant an apparent father in this

case.

          Dix next argues "plain error" in the trial court's

failure to appoint a GAL at the outset of the proceedings.  Coun-

sel states:  "The court must appoint a [GAL] before any issue is

determined that might affect the child," citing McDonald v.

McGowan, 163 Ill. App. 3d 697, 516 N.E.2d 934 (1987).  

          First, McDonald is not authority for that proposition,

nor does the law impose such a requirement.  The GAL performed

valuable services in this case, but it was not essential that a

GAL be appointed.  Often the child's interests are adequately

protected by one or the other parent, or by the court, and the

appointment of a GAL is not worth the cost.  See In re Marriage

of Wycoff, 266 Ill. App. 3d 408, 417, 639 N.E.2d 897, 905 (1994).

          Second, at the outset of the March 1995 hearing, the

court stated it would probably appoint a GAL but it was taking

advantage of time it then had to hear evidence; both parties were

apprised they could present other evidence as needed when the

matter was rescheduled.  When Gagnon was asked if he had any

objection to a GAL being appointed, he said he did not.  The

court and Gagnon's counsel engaged in a brief colloquy on the

possible GAL appointment before Gagnon was tendered for cross-

examination.  At the April 3, 1995, hearing on economic issues,

Dix acknowledged she would drop her support action if Gagnon

dropped the visitation petition.  In questioning by the court Dix

stated:  "I cannot afford your [GAL], I have released my attor-

ney, I cannot afford this."  

          On April 6, 1995 (filed June 9, 1995), Dix advised the

court and Gagnon's attorney by letter that her employing unit

would cease to exist June 30 and she would be employed elsewhere

as of July 1; she requested the case be expedited and concluded

by mid-June.  On April 26, 1995, a motion to withdraw as counsel

for Dix was filed on behalf of Brown, Hay and Stephens stating it

was advised she did not have funds to engage attorneys in the

matter and would represent herself.  On May 5, 1995, Dix filed

her appearance as party pro se and the court allowed the law firm

to withdraw.  On June 1, the court by letter advised it had de-

cided it was in Kiley's best interest to begin visitation with

her father, according to the schedule his attorney had proposed,

and directed counsel to prepare the order.  Not until her

June 21, 1995, motion to reopen, represented by new counsel, did

Dix seek appointment of a GAL.  The court then accommodated her

and made the appointment.

          Third, there is nothing in the record demonstrating

prejudice to Dix or Kiley.

                             III.  CONCLUSION

          In closing, we are constrained to admonish the parties

that it is for each of them to rise above their personal dif-

ferences and fears and to cultivate Kiley's relationship, love,

and respect for each other.  In Kiley's presence and within her

hearing, each should be discussed only in a positive way by the

parties and their friends and relatives.  Perhaps Gagnon and his

family should have been involved in Kiley's life earlier, but let

that situation now be remedied.  So far as the record before this

court shows, the parties have an intelligent child to raise and

they should cooperate to that end.

          For the foregoing reasons, the ruling of the trial

court is affirmed.  

          Affirmed.

          STEIGMANN, P.J., and KNECHT, J., concur.