2024 IL App (2d) 240471-U
No. 2-24-0471
Order filed December 18, 2024

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF ALISHA ECKBURG, | ) | Appeal from the Circuit Court |
| | ) | of Kane County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 20-D-764 |
| | ) | |
| JOSHUA ECKBURG, | ) | Honorable |
| | ) | Bradley P. David, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Schostok and Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's denial of petitioner's petition for permanent relocation with her minor children was not against the manifest weight of the evidence. Affirmed.

¶ 2    In this post-decree matter, petitioner, Alisha Eckburg, appeals from the trial court's denial of her petition to permanently relocate to Idaho with her four children from her marriage to respondent, Joshua Eckburg. Alisha argues that: (1) the court failed to consider the impact of the temporary relocation on the children and herself; (2) the guardian *ad litem* (GAL) and the court failed to ascertain the children's wishes as to relocation; (3) the court failed to consider Joshua's unhealthy behavior toward Alisha and his lack of involvement with the children and litigation; and

(4) the court erred in determining that Alisha's reasons for moving to Idaho weighed against relocation by failing to recognize her motive to leave an abusive situation, to maintain the children's current emotional state in Idaho, and her significant improvement in her financial situation. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4     The parties were married on June 11, 2005, and the marriage was registered in Pennsylvania. Alisha worked part-time providing music lessons, but was primarily a stay-at-home mother during the marriage. Joshua is an attorney. The parties had four children together: Gavin (born August 6, 2012), Clara (born August 24, 2014), Caitlyn (born September 19, 2016), and Grace (born August 11, 2018). On July 14, 2020, Alisha petitioned to dissolve the parties' marriage.

¶ 5     On November 22, 2021, the parties entered into an agreed allocation judgment that allocated their parenting time and responsibilities. It provided that both parties had parenting responsibilities for their children but, if they could not come to an agreement, Alisha's decision controlled. The agreement also addressed Joshua's parenting time, providing, until such time as he had suitable living arrangements for overnight parenting time (*i.e.*, each child had their own bed and there were at least two bedrooms for them to share at his residence): Tuesday from 5 p.m. to 8 p.m. and Wednesday from 5 p.m. to 8 p.m. (during Awana, a church youth group, season) or Thursday from 5 p.m. to 8 p.m.; and Saturday from 9 a.m. to Sunday 3 p.m. (week one) and Friday after school or 5 p.m. if no school through Sunday at 3 p.m. Joshua would have only two children at a time for overnight parenting time. His overnight parenting time would consist of alternating weekends from Friday after school or 5 p.m. if no school until Sunday at 7 p.m.

¶ 6   The parties entered into a marital settlement agreement, which was filed on March 15, 2022, and, on the same date, the trial court entered a judgment for dissolution of marriage.

¶ 7   A. Alisha's Petition to Restrict and Relocation Petition

¶ 8   On October 2, 2023, Alisha filed a verified two-count petition for temporary removal and permanent relocation (relocation petition) and a verified petition to restrict parenting time and for other relief (petition to restrict). In the relocation petition, she asserted that the parties resided in Aurora, and she sought to temporarily remove and permanently relocate the minor children to Coeur d'Alene, Idaho. As to her request for temporary relocation (count I) (750 ILCS 5/603.5(a-5) (West 2022)), Alisha alleged that she had been informally offered a new job opportunity, with greater pay, at a private school in Coeur d'Alene, which additionally provided her with the opportunity to have the minors attend school full time at no cost to the parties. The school the children would attend presented significantly improved opportunities and resources for them when compared to the below-state-average public school in Aurora that they presently attended. Alisha further alleged that her significant other, Kevin Hochstetler, lived in Coeur d'Alene, and they intended to marry upon her relocation. She has no familial ties to Illinois, as her immediate family members all reside in Pennsylvania.

¶ 9   Addressing Joshua, Alisha alleged that he suffered from mental illness that had put the parties and the children at risk of harm, as shown through his verbal and physical acts. He refused to allow the children to leave his residence unless they prayed for him and Alisha to get back together; Joshua yelled at Alisha during drop-offs when the children were present, which has forced her to hide at the exchanges; Joshua broke Alisha's front door latch and door jam during an exchange, which prompted the police to be called, and, in the children's presence, he advised Alisha that they were not divorced and he would not leave her residence; the minors expressed

their desire to no longer visit Joshua during his parenting time due to his actions; and they have referred to spending time with him as "torture," that he is "mad all the time," and that they do not feel emotionally safe with him. Alisha further alleged that Joshua resided in a two-bedroom apartment, and the children all share one bedroom when they reside with him, in violation of the parties' allocation judgment. She asserted that, due to the better educational opportunities, her job opportunity, and her desire for stability and a supportive environment for the children, immediate temporary relocation to Coeur d'Alene was in the children's best interests until the court determined the issue of permanent relocation.

¶ 10 As to the permanent relocation count (count II), Alisha alleged that relocation to Idaho was in the children's best interests. 750 ILCS 5/609.2(b) (West 2022). She pointed to her job opportunity at Classical Christian Academy, where she will be allowed to teach in a field in which she has an advanced degree. This opportunity is not easily attainable where she presently resides. Her significant other resides in Coeur d'Alene and will be able to assist Alisha, she asserted, with the children during her residential transition. The children will be able to attend the same private school where Alisha was offered a position and at no additional cost to the parties. The academic, personal, and religious opportunities at the school are not available at the public schools in Aurora. Alisha also alleged that she has no familial ties to Illinois, and Joshua's immediate family in Aurora does not spend meaningful time with the children. The minors reside primarily with her, fear Joshua, and have become apprehensive about visiting him due to his substandard living conditions, erratic and often-times verbally abusive behavior, and lack of empathy and connection to the children's feelings. They refer to Joshua as "scary daddy," have referred to staying with him as "torture," and stated that Joshua is "mad all the time." Alisha further alleged that Joshua stated to

the children, "just kill me now," "Jesus take me," "end my miserable life," and "[G]od just take me to heaven," causing them to be scared, anxious, and frightened while in his care.

¶ 11   Further, Alisha alleged that during their breaks from school, they can remain in steady contact with Joshua.  The children, ages 11, 9, 7, and 5, have, individually and collectively, expressed a desire to reside with Alisha in Idaho and to be with her significant other, with whom they have all had positive experiences (and with his children).

¶ 12   In her petition to restrict, Alisha alleged that, since the allocation judgment, Joshua's behavior toward her and the children had become threatening, harassing, abusive, and increasingly alarming.  Specifically, Joshua texted her about one dozen times per day for purposes unrelated to the children and on inappropriate and harassing topics; the parties were unable to effectively communicate concerning the children, and Joshua had voluntarily had little-to-no involvement in decision-making responsibilities for the children; Joshua was emotional toward the children, crying, stating he missed being a family, praying Alisha would change her mind, and told Alisha they were still married; he would not allow the children to leave his residence after his parenting time unless they prayed for their parents to get back together; he yelled at Alisha during exchanges and in the minors' presence; he broke Alisha's front door, refused to leave her house, and told her they were still married (in front of the children), and Alisha called the police; she believed that Joshua suffered from mental illness that put her and the children at risk of harm; Alisha's friends and neighbors had observed Joshua's erratic and threatening behavior at exchanges and had expressed concern for Alisha and the children's safety; and the oldest three children had expressed to Alisha that they were scared of Joshua, did not want to spend time with him, that being in his residence was "torture," and one of the children feared going to Joshua's house for parenting time due to the yelling so she hid in Alisha's bathtub.  Alisha also alleged that Joshua had suicidal

ideation and stated to the children, "just kill me now," "Jesus take me," "end my miserable life," and "[G]od just take me to heaven," causing the children to be scared, anxious, and frightened while in his care.

¶ 13    Alisha argued that the foregoing behaviors had occurred since entry of the allocation judgment and that it was in the children's best interests that Joshua's parenting time be suspended and/or supervised and that Alisha be allocated sole decision-making responsibilities for the children.  She also requested that: the parties be required to communicate solely through AppClose or Talking Parents, Joshua be ordered to attend anger management class, the parties have no contact during parenting time exchanges, and Joshua be ordered to remain in his vehicle during the exchanges.

¶ 14    On October 17, 2023, the trial court ordered the parties to attend mediation with attorney Lynn Mirabella and set the case for hearing on December 11, 2023.  Joshua did not appear in court on October 17, 2023, nor did an attorney appear on his behalf.  On November 1, 2023, Mirabella filed a report, stating that mediation did not take place.

¶ 15        B. Trial Court's Ruling – Temporary Relocation and Parenting Time

¶ 16    On December 12, 2023, the trial court granted Alisha's petition to temporarily relocate (count I) and granted her petition to restrict.  It modified the allocation judgment, permitting Alisha to relocate with the children to Coeur d'Alene, granting her sole decision-making authority for the children, and ordering that Joshua have no parenting time.

¶ 17    Joshua moved to vacate or to reconsider, arguing that the court file did not contain proof of service reflecting that he was given notice of the December 11, 2023, hearing date and alleged that he would testify that he was not aware of that hearing date or that his parental rights were immediately imperiled.  He argued that the December 12 order effectively terminated his parental

rights, where it wholly restricted his parenting time, terminated his decision-making responsibilities, and allowed Alisha to relocate the children almost 2,000 miles away. He sought vacatur of the order and a hearing on the merits. In his motion to reconsider, Joshua argued that the December 12, order should be reconsidered because Alisha did not provide notice to him (or the court) of her intended relocation (*id.* § 609.2(c)).

¶ 18    Alisha responded that Joshua is an attorney, and he represented himself throughout the proceedings prior to entry of the dissolution judgment. He also, she asserted, received notice of the filing of her two petitions on October 2, 2023, as well as subsequent orders. According to Alisha, Joshua was aware of the pending post-decree litigation, and she believed that, in an intentional effort to harass her, he chose not to participate.

¶ 19    On March 12, 2024, the court appointed Thomas St. Jules as GAL and set the case for trial in August 2024. On May 7, 2024, the court denied Joshua's motion to vacate or reconsider with respect to Alisha's temporary relocation, but, with respect to her decision making responsibility, granted it and, thus, vacated that aspect of its December 12, 2023, order. The court also vacated its determination Joshua would have no parenting time, and it reserved the issue. It also ordered the parties to cooperate to schedule regular, recurring phone calls between Joshua and the children, to occur at least three days per week.

¶ 20    On May 14, 2024, Joshua moved for temporary parenting time, asserting he had not had parenting time for six months and had infrequent electronic access to the children. He sought liberal parenting time prior to the upcoming trial dates. On May 29, 2024, the trial court granted Joshua temporary parenting time in Illinois from June 15 to June 23 and for two weeks in July.

¶ 21    On July 1, 2024, Alisha petitioned for an Illinois Supreme Court Rule 215(a) examination of Joshua, and, on August 1, 2024, the court denied the petition. On August 2, 2024, Alisha moved

for *in camera* interviews of the children, and, on August 5, 2024, the trial court granted the motion with respect to Gavin and Clara.

¶ 22          C. Trial on Permanent Relocation and Petition to Restrict

¶ 23    Trial on Alisha's relocation petition and petition to restrict was held on August 5, 7, and 8, 2024.

¶ 24          1. Thomas St. Jules - GAL

¶ 25    St. Jules initially testified in narrative form, noting that he was appointed as GAL after the children had moved to Idaho. When making a list of witnesses he wishes to speak to, he asks the parties for names. He spoke to everyone on the parties' witness list, with the exception of one of Alisha's witnesses, who never returned his calls. St. Jules spoke to about 14 witnesses and, on multiple occasions, to the children in person and on Zoom.

¶ 26    The family lived in Aurora from 2018 to December 18, 2023. The parents related that they did not precisely follow the allocation judgment. Alisha told the GAL that Joshua had the children for weekly overnights on Tuesdays and either Fridays or Saturdays. He also had parenting time with Clara one night per week to take her to gymnastics and had additional time with Gavin depending on his baseball schedule. Joshua also had weekly parenting time with at least three of the children, including on Wednesdays at a church youth program. Thus, he saw the children about four or five days per week. Joshua related to St. Jules that he saw the children almost daily and had them for overnights on Tuesdays.

¶ 27    St. Jules conducted a home visit of Joshua's one-bedroom apartment in Aurora. It contained two bunk-bed sets where the children slept. The children gave St. Jules a Zoom tour of their home in Coeur d'Alene, which is a four-bedroom single-family residence. Gavin and Clara

share a bedroom, and Caitlyn and Grace share another bedroom. St. Jules spoke more to Gavin and Clara, the two older children.

¶ 28    Gavin, according to St. Jules, had just finished fifth grade and is interested in baseball and fishing, which were activities he had spent a lot of time doing with Joshua. He is an active child with lots of friends in Aurora and Coeur d'Alene. Gavin told St. Jules that Idaho was less of a struggle than he thought it would be, he had made good friends at school, still spoke to his Aurora friends via video games, and he missed those friends and his father. During a June 21, 2024, visit to see Joshua, the girls ran to their father upon seeing him at the airport, and Gavin hugged his father. This visit was one week long, and Gavin expressed that it was fun but it was difficult to get alone time with his father. During this visit, per Gavin, his father was praying for miracles revolving around him and Alisha getting back together. To St. Jules, it seemed that this was not something that he enjoyed. Gavin told St. Jules that he was looking forward to his next visit with Joshua in the summer, but he also enjoyed Idaho, his time with Kevin, and Kevin's children. The children returned to Illinois for a two-week trip in July 2024. Gavin related things that were not fun about the trip, including missing his mother, missing his Idaho friends, and wishing he had brought his fishing pole so that he and Joshua could go fishing. He also related that Joshua's praying about Alisha had subsided, which he was happy about. Gavin still wanted alone time with Joshua, but he gave details about fun things that he, his sisters, and Joshua did during the visit.

¶ 29    Next, addressing Clara, St. Jules stated that she is nine years old and her major activity was gymnastics. She described being active with friends in both Aurora and Idaho. She often spoke of a close friend in Aurora named Greta. During St. Jules' first visit with Clara, Clara stated that the move to Idaho was both exciting and scary, that she missed her dad nights, and she missed her Aurora friends. During a second meeting, Clara described seeing Joshua at the airport and running

to him and hugging him. She described going to the grocery store with Joshua without her sisters and that it was very nice. "She had some apprehension about coming back for a second visit and said that she just kind of wanted to come back." On July 3, 2024, St. Jules followed up with the children during a virtual tour of their house and learned that Clara wanted to speak to him the next day on Zoom. When they spoke, Clara told St. Jules that she felt uncomfortable with dad praying for mom to change her mind and that dad had a screenshot on his phone of him and mom and that made her feel a little uncomfortable. When asked, she said that she never spoke to her father about it. She characterized her first trip back to visit Joshua as 80 to 90 percent good. St. Jules next saw Clara during the children's two-week trip. Clara described multiple fun activities they enjoyed with Joshua, siblings, cousins, and friends and a trip to Wisconsin. She got sick with an ear infection during the visit and had to go to the emergency room. Clara liked Idaho because there are no tornadoes there; there was a tornado in Aurora during their visit. Joshua was not always with them. Sometimes he coached the baseball team or was on his phone doing work. This was something she did not like about her trip. She also missed Alisha a lot, the mountains, her Idaho friends, her dog, and her chicken.

¶ 30    Caitlyn, age seven, related that she is involved in her church group. She has made new friends in Idaho. It is different not having daddy nights, and it does not feel that there are enough things for her to do. She also stated that she needs her dad, misses him a lot, wishes he were here, and wishes it were more like Illinois. During a second conversation, while on the one-week visit to Illinois, she saw dad on the escalator at the airport and stated to her sister "Is this a dream? Squeeze me, Grace. It was so fun." She was excited for the next visit. During the two-week visit, she was excited to see Joshua and described activities they did with Joshua, friends, and family that were fun. She also stated that she really missed mom and missed her Idaho friends.

¶ 31    Grace, age five, stated that her favorite part about Idaho was getting to spend time with Caitlyn. She is very energetic and silly, according to St. Jules. Her favorite thing about her mother is snuggling with her, and her favorite thing about her father is playing with him at parks. At the end of her two-week visit, Grace told St. Jules that it had been good and fun but she missed her Idaho friends.

¶ 32    St. Jules observed Joshua interacting with the children during a visit to Blackberry Farm. They appeared to be a loving and connected family and were having a great time together.

¶ 33    St. Jules spoke to various people that Alisha and Joshua had asked him to speak with. The witnesses expressed concerns about Josuah's anger and his inability to move past his divorce. Oftentimes, they expressed this information from what they had been provided by Alisha.

¶ 34    Addressing the statutory factors, St. Jules opined that he did not believe Alisha's reasons for relocation—her concerns for Joshua's mental health and emotional abuse—and related that her father stated that Alisha's *primary* reason for moving was to be with her significant other and, *secondly*, she was fearful of staying close to Joshua. Her reasons, St. Jules believed, did not outweigh them staying in Illinois. Joshua had a valid concern about seeing the children if they lived in Idaho. The children adore Alisha, and Joshua was a highly involved parent; they both have a quality relationship with the children. St. Jules "did not see" that the children spending time with their father was torture to them. Addressing the schools in Aurora and Idaho, St. Jules opined that they were not significantly different in the middle-school and high-school levels. As to family, Alisha has no family in Idaho or Illinois, and Joshua has family in Illinois. Kevin lives about a three-minute walk from Alisha's house, and they eat together and hang out after school as a group. Kevin and Alisha knew each other from college, started talking on the phone in September 2022, and had their first in-person visit in January 2023. He met Alisha's children in

the spring of 2023, and he brought his children to meet them during spring break of 2023. Gavin and Alisha visited Kevin in Idaho in the summer of 2023.

¶ 35　St. Jules opined that the children were thriving in Illinois and appear to be thriving in Idaho. They had friends in Aurora and have friends in Idaho. Clara's Aurora elementary school reported that she began having anxiety attacks at the time the divorce proceedings started. It took 20 to 30 minutes for school personnel to calm her down before she went to class. Alisha reported that the attacks have not occurred in Coeur d'Alene. Alisha also told St. Jules that Clara had night terrors in Illinois. She also reported that Gavin had bedwetting issues in Aurora, but did not have them in Idaho. Due to the distance, St. Jules opined, it would not be possible to fashion a parenting schedule that resembles what was exercised in Illinois.

¶ 36　Next, St. Jules addressed the children's wishes, stating that he did not specifically ask them if they would prefer to live in Idaho or Illinois. He explained that he felt that, given their ages, it was not appropriate to ask. The children associate Idaho with their mom and Illinois with their dad. The children reported that they like Idaho, have made friends there, and they like spending time with Kevin and his children. They appear to be doing well in Idaho. They also reported to St. Jules that they also missed their father and Aurora. St. Jules related that, if the court were to ask the children, they would respond that they prefer to be in Idaho because they would feel they are with their mom and they are accustomed to being with their mom most of the time. There were no possible arrangements for in-person parenting time, St. Jules opined, given the great distance between Idaho and Illinois; Facetime is not a substitute. He further opined that it is impossible to replicate the parent-child relationship that the children were experiencing with Joshua in Illinois with any amount of extended stays if they lived in Idaho.

¶ 37    St. Jules also addressed Joshua's mental health, opining that he is struggling with the divorce and potentially with depression and is not adequately addressing his issues.  This can negatively impact the children, but St. Jules did not believe they weighed in favor of allowing permanent relocation to Idaho.  Finally, St. Jules noted that he spoke with a counselor the couple had seen at one point.  Alisha stated that he had expressed to her that she needed to speak with Aurora police because Joshua was potentially dangerous.  St. Jules contacted the counselor, who denied stating what Alisha represented he said.  He stated that he never believed that Joshua was suicidal or homicidal, but did believe that he was depressive at times and that the counselor might have spoken to Alisha in generalities that she should take precautions if she felt Joshua was a danger.  The counselor stated that he never had any concerns that rose to a level that he would seek to involuntarily commit Joshua or make any calls relating to concerns about him and the children.

¶ 38    Ultimately, St. Jules opined, both parents are loving parents and the children love both parents.  He believed that a move to Idaho would substantially impact the children's ability to have a quality relationship with Joshua.

¶ 39                                    2. *In Camera* Interviews

¶ 40    In her motion for *in camera* interviews of the children, Alisha noted that the GAL had not asked the children what their specific wishes were concerning their residence.  Joshua objected, arguing that it was procedurally unfair based on the last-minute nature of the request, that there was a lack of safeguards of reliability because the children had seen Joshua infrequently over the prior eight months, and the interviews could be injurious to the children's best interests by forcing them to choose between their parents.  The trial court, on August 5, 2024, granted Alisha's motion, ordering that only Gavin and Clara would be interviewed, ordering that the GAL be present, and asking for the parties to submit agreed-upon questions prior to the interviews.  The court also

ordered that the questions relate to Illinois and Idaho, "not to mom's house and dad's house," *i.e.*, a preference for a particular parent. The parties waived being present for the interviews.

¶ 41 The *in camera* interviews occurred on August 6, 2024. Gavin stated that he was celebrating his twelfth birthday. He had been living in Idaho for about six or seven months, and his favorite parts about being in Idaho were the activities, including mountains, hiking, boating, tubing, and fishing. When asked what he did not like about Idaho, he replied that he did not like not knowing a lot of people there because he was new. Gavin did not know everyone in his neighborhood. What he liked best about Idaho was fishing. Turning to Aurora, he liked that he lived in a nice neighborhood, knew everyone, and had a lot of very good friends with whom he had sleepovers and road bikes. He did not like how there was not a lot of open space there. The best thing about living in Aurora was his friends and having sleepovers. Next, Clara stated that she was nine years old. She likes the people in Idaho, specifically, her friend Carter and some of Gavin's friends. They are very nice. She also likes that there are no tornadoes. There is not anything that she does not like about Idaho. Her favorite thing is the people, who are very nice. She goes tubing and swimming in lakes in Idaho, which she did not do in Illinois. Turning to Aurora, Clara liked playing with her neighbor there and her best friend lived a few blocks away. The best part of living in Aurora was hanging out with her friends and having sleepovers with them. She has had a few sleepovers in Idaho. When asked what she did not like in Aurora, Clara replied that, sometimes, people at school were mean. She told her teachers, and they helped her work through it.

¶ 42                                     3. Ashley Hostetter

¶ 43 During Alisha's case-in-chief, Ashley Hostetter, Alisha's sister, testified as follows. She is a human resources executive and has seen Alisha and the children about five times in the last two years. Alisha is a caring mother, is attentive to the children, home-makes almost all meals,

plays with the children, and cares about their emotional health. Ashley visited Idaho for five days during the week of June 10, 2024. She observed that the children were very happy, showed her their chickens, and took her around their neighborhood to where their friends live. They seemed very well adjusted and pleasant at home. She observed nothing that concerned her.

¶ 44     Ashley had also observed the children when they lived in Illinois (between January 2023 to January 2024). In March 2023, Ashley observed Alisha with the children; Joshua was no longer in the home. The children were well taken care of, but appeared to be having a difficult time emotionally. When it was time for Joshua to come and get the children, Gavin and Clara became emotionally distraught. When Gavin returned from the visit, he was very emotional. Clara was also emotional. They were crying, angry, and appeared to be overwhelmed. Gavin also had bedwetting issues that appeared to be connected to anxiety that was caused by his father.

¶ 45     Ashley further testified that Alisha always encouraged the children to see their father. Addressing Alisha's demeanor, Ashley stated that, in Illinois, Alisha seemed overwhelmed emotionally, tried to help the children with their emotional distress, and was increasingly nervous about their and her own safety. Once, Ashley was in the home when Alisha received a text message from a neighbor about Joshua that caused her some concern. In Idaho, Alisha seemed much more relaxed and happier, and she seemed to feel safer there.

¶ 46     Ashley observed Joshua's interactions with the children in September 2021. He yelled a lot at them, was impatient, did not engage in a lot of parental caretaking (food or baths), and he was absent a lot (for bike rides or to go to church). He also gaslit the children when they cried, and he yelled at them multiple times per day. During Christmas 2023, Alisha called Ashley, stating that she feared Joshua and did not know what to do. Ashley advised her to install security cameras and reach out to the couple's counselor. Alisha installed a security system.

¶ 47    Ashley is concerned about the children's health because Joshua lives on the 16th floor of his apartment building, and he has not installed air conditioning. The children complain about how hot they are. She is also concerned, if the children get sick, because, on two occasions, Joshua refused for Alisha to take Caitlyn and Clara to the emergency room. Alisha took them to the hospital, and the doctor shared that, if she had not done so, the sickness would have been life threatening. One child was dehydrated (she cried but no longer had tears) and the other was also "very severe." Joshua did not purchase health insurance for the children, and Ashley sent them $10,000 for insurance. The children shared with Ashley that Joshua feeds them fast food and microwaved meals. Ashley also has concerns about Joshua's anger management issues, and she worries about the children's emotional health when they are with him. Caitlyn shared with her in December 2023 that Joshua continued to pray in front of them, including suicidal prayers and that he and Alisha would get back together.

¶ 48                                    4. Joshua

¶ 49    Joshua testified that, since the divorce, he has lived in a one-bedroom apartment. Under the allocation judgment, he could have more parenting time if he obtained suitable living arrangements, specifically, at least a two-bedroom apartment with beds for each child. In July 2024, he renewed his lease to remain in the one-bedroom apartment. He is currently looking for alternative housing. Joshua earns a base salary of $150,000 per year and receives variable bonuses. His net income in 2023 was $120,000. He pays about $4,500 per month in child support. Alisha mentioned moving in the spring of 2023; she asked Joshua if he was interested in moving to Idaho.

¶ 50    The couple did not follow the parenting plan. Alisha offered that some of the children could stay overnight on Tuesdays. Addressing his parenting time, Joshua testified that, in practice, he kept all four children at least one weekend and on Tuesday nights.

¶ 51    After the divorce, Joshua showed up at Alisha's house unannounced on one occasion. He frequently asked Alisha to see the children during her parenting time. On some occasions when Alisha said no, he asked again. Also, Alisha asked Joshua several times to stop texting her because he kept asking her.

¶ 52    During the marriage, Alisha made doctor's appointments for the children and took them to the appointments. Joshua testified that he did not believe that the children had a pediatrician in Illinois. His parents have never been to his apartment. Alisha has repeatedly asked Joshua not to let the children visit his parents because Joshua has concerns about his father's drinking. Clara had anxiety going into elementary school. She took 20 to 30 minutes to calm down before entering the school.

¶ 53    Since April 2010, Joshua has worked at Herbert & Eckburg LLC. He is a real estate associate attorney. Family members work at the firm. Due to a disagreement with an employee over her work product, for which the children were not present, he was previously barred from coming to the office Monday through Friday between 9 a.m. and 5 p.m., but was permitted to return to his office one year ago. (The employee was permitted to work there while Joshua was barred and continues to work there.) Joshua testified that he considered taking his life before and has made statements regarding taking his life to others. He is aware that Alisha has been afraid of him in the last two years. At times, he has difficulty controlling his emotions, including in front of the children. He did not block Alisha when she tried to leave a baseball game. Alisha had alleged as much in a September 2023 text message to Joshua. In a responsive text, Josha stated that he did not mean to block her way. Also, he acknowledged in the message that he comes across as emotional and defensive and becomes scared very easily.

¶ 54    Joshua further acknowledged that, at trial, he was wearing his wedding band from his marriage to Alisha.  He continued to wear it in front of the children.  Joshua frequently prayed in front of the children for the family to get back together.  He has a picture of himself and Alisha on the home screen of his phone that the children have seen.  The court ordered him to sign up for Family Wizard to schedule visits with the children, but he never enrolled for the service.  In March 2023, on the anniversary of his divorce, Joshua had the children hand Alisha flowers he had bought her.  He also gave Alisha flowers on the anniversary of their wedding following their divorce.  Alisha asked him to stop after he sent her flowers in March 2023, but Joshua sent her flowers again in June 2023.  Joshua is not currently seeing a therapist and does not believe he needs to see one.  He does not believe that he is still married to Alisha.

¶ 55    Joshua has not visited the children in Idaho.  He testified at his deposition that he did not know if he would take steps to see the children in Idaho if they ended up staying there permanently because he has no one there.  Joshua has not asked Alisha what school the children are attending or who their doctors are in Idaho.  Nor has he contacted the school or any doctors or coaches.  Joshua further testified that the children have friends in Idaho and have a loving relationship with Alisha.  Gavin has told him that he still has bedwetting issues, but Joshua has not called his pediatrician to confirm or spoken to Alisha about it.

¶ 56    Joshua objects to the relocation because he wants to involve himself in the children's lives.  He testified that he is able to place the children's needs above his own.  Joshua conceded that it would disrupt the children to be uprooted from Idaho but not as much as it disrupted them to move to Idaho.  He acknowledged that he testified at his deposition that he did not know if he could put the children's needs above his own if he was not with them geographically, but testified that he did not know if he could only place the children's needs above his own if they were in Illinois.

¶ 57    Joshua has practiced law since 2016. He represented himself pre-divorce and filed an appearance and response to Alisha's dissolution petition. Joshua confirmed he used a particular email through the divorce and communicated with opposing counsel using that address. On October 2, 2023, he received an email from counsel's office with a notice and petition to relocate and a petition to restrict. The notice of motion stated that the petitions were going to be presented on October 17, 2023. Joshua acknowledged that he did not appear in court on that date, nor respond to counsel's office at any time after receiving the documents. He did not receive a copy of the order continuing the motion for hearing on December 11, 2023.

¶ 58    Joshua also conceded that, on November 1, 2023, he received an email from the mediator, including a mediation report. He did not attend mediation or reach out to the mediator's office to schedule mediation. Thus, he had notice there was litigation concerning the relocation of his children and restrictions on parenting time but chose not to appear in court. Joshua also did not appear in court on December 12, when the court heard the petitions and ruled. He was aware that it was Alisha's intent to move to Idaho as far back as June 2023.

¶ 59    Joshua is 75% busier at work in the summer months. When Alisha filed for divorce, he did not want the divorce. He never told Alisha that they are still married. Joshua is not aware of any pediatrician the children have in Idaho and he is unaware if they had a regular pediatrician in Illinois. Alisha never provided Joshua details about Gavin's baseball or the children's school. Alisha never asked Joshua to come visit or say that he could visit the children.

¶ 60                                    5. Alisha

¶ 61    Alisha testified that she rents a four-bedroom, 2,200-square-foot home in Coeur d'Alene. She sold her Aurora home, which was a four-bedroom, 2,000-square-foot home, around December 2023/January 2024.

¶ 62     The parties married in 2005 and divorced in 2022. Alisha moved to Idaho in January 2024. Prior to relocating, Joshua exercised his parenting time on Tuesday evenings and one weekend, every other weekend. The parties communicated via text. Alisha preferred this method because Joshua tried to have conversations with her in front of the children, and she believed this was inappropriate. Joshua was also emotional and tried to talk about other things when parenting exchanges were in person; she felt unsafe. When Alisha told Joshua that she would not have a conversation with him in front of the children, he would get angry, and Alisha would try to remove herself from the situation and shut her door. On one occasion, Joshua broke her front door jam. The children were in the living room; they said they were scared when Alisha went inside. She spoke to her therapist, who advised her to contact the police; she did, and they advised her to document any such incidents.

¶ 63     In the spring of 2023, Alisha tried to leave a baseball game. Joshua yelled at her in front of others and asked her why she did not treat him like a person and that she had to speak to him. Alisha told Joshua that she did not want to have conversations with him in person and preferred text messages. She tried to leave, walking toward her van and holding Grace. Joshua blocked her three times. Alisha left. She was afraid because Joshua seemed very agitated and obsessive toward her. He also occasionally showed up unannounced at her home in Illinois to see the children. Several times, Joshua also went to the children's school unannounced during Alisha's pickup or drop-off day. She also observed Joshua drive by her home.

¶ 64     Alisha further testified that Joshua's texts made her uncomfortable. He texted her almost daily about 12 texts per day. They were not always logistical texts. He also repeatedly asked for time with the children during her parenting time; Alisha told him no. Also, usually every morning and evening, Joshua texted Alisha stating that he was praying for her and the children. Every

morning, she asked him to stop. After the divorce, Joshua brought flowers to Alisha's home, along with the children. He did so the day after the divorce, the anniversary of the divorce, their wedding anniversary after they were divorced, and Mother's Day.

¶ 65 During exchanges in Illinois, Gavin was very distraught and did not want to see Joshua. He did not like his father's apartment. Alisha found Clara hiding in the bathtub, and she climbed trees so that she could avoid parenting exchanges; she would have to be physically put in Joshua's van and the door would have to be quickly shut to prevent her escape. On one occasion, she ran from Alisha's house when she knew Joshua was coming, and a neighbor drove around to find her. Clara appeared to not feel safe. Grace and Caitlyn were usually okay at the exchanges, but there were times Grace cried, especially as the year progressed. Toward the end, she did not want to go to Joshua's home. When she returned to Alisha's home, she complained that her ears hurt due to Joshua's yelling. After the children returned from Joshua's parenting time, they appeared depressed, were angry with Alisha because they stated she made them go, and Gavin would lay on the couch and cry sometimes. They stated that they did not want to go the next time. While in Illinois, Alisha observed that the children returned home scared and anxious. Although the children enjoyed short amounts of time with Joshua doing activities, they appeared to be anxious when spending time at Joshua's apartment and complained that there was a lot of yelling, Joshua hit counters, or slammed chairs. However, since moving to Idaho, the behaviors have changed.

¶ 66 Alisha further testified that Joshua prayed in front of the children for him and Alisha to get back together. The children told her that they were not allowed to leave his apartment before he would pray that Alisha would change her mind. They stated they were late to school multiple times due to the praying. The praying that they would get back together took an emotional toll on the children.

¶ 67    Addressing the children's school performance, Alisha testified that they did well (as evidenced by report cards from their Idaho school for the period January to June 2024 that were admitted into evidence), were very smart and social, and excelled physically.  Clara experienced anxiety many days when going to school.  The episodes occurred for 20 to 30 minutes and occurred for several years.  They have not occurred since she moved to Idaho.  She is more outgoing at her new school; she appears to be lighter, freer, and happier.

¶ 68    Alisha testified that she attended every parent-teacher conference for each of her children; Joshua attended most of them as well.  Gavin had a bedwetting alarm while in Illinois; it did not work.  He still has one in Idaho, but he no longer wets the bed.

¶ 69    Alisha contradicted Joshua's testimony that the children did not have a pediatrician in Illinois, stating that they did, that she made the appointments, and took the children to the doctor. In Illinois, Joshua took Gavin more to baseball practices and both he and Alisha took Clara to gymnastics practices.  In Idaho, Gavin plays baseball and Clara does gymnastics.  Caitlyn and Grace are also going to start gymnastics.  Joshua has not asked about attending any of Gavin's games, but has spoken to Gavin about them.  Nor has Joshua inquired about doctors in Idaho or whether the children have any.  Joshua also did not inquire about who their teachers are in Idaho. Alisha signed up for OurFamilyWizard per the court's order, but Joshua did not.

¶ 70    The children have made friends in Idaho.  Alisha and the children go fishing and hiking. Clara loves the chickens in the backyard and enjoys Kevin's pet bunnies.

¶ 71    Alisha believes that the children wish to remain in Idaho.  She testified that her main reason for moving to Idaho was to be somewhere safe and to be at peace.  Alisha had the sense that the children also wanted to move.  (The move cost $35,000.)  Another reason Alisha moved was because of Kevin, her boyfriend.  They met in 1999 in college and dated for one year.  They

reconnected in the fall of 2022 through a mutual friend. She learned that Kevin was divorced. Their relationship started as very good friends, as they were both single parents with four kids (his children are ages 15, 13, 12, and 10). He visited from Idaho in January 2023, and they started dating that month. Kevin lives in Coeur d'Alene. He shares custody 50/50 with his ex-wife, who also resides in Idaho. Alisha stated that she and Kevin plan on getting married. "My goal in getting out [there] was to be safe but also we know we intend on getting married." They live about two or three blocks apart, and the children frequently see each other.

¶ 72    When Alisha initially decided she wanted to move to Idaho, she looked for employment there and found out about a job at Classical Christian Academy, which is the school Kevin's children attend. Kevin had spoken to the superintendent about the possibility of hiring Alisha as a music teacher. She had an informal interview at the school in early fall and then another interview in November, after which the superintendent told her to let him know when she was moving. Alisha's impression was that she would be receiving a job offer. However, the superintendent stepped down due to a family health issue and a new headmaster was hired in December; he brought in a different teacher. Alisha applied for other jobs. She has had two interviews and been informally offered a job as a music teacher at a charter classical academy. There is a board meeting on Monday (*i.e.*, August 12, 2024) to vote her in; thus, Alisha is waiting for board approval. The salary is $48,000 with benefits such as dental, vision, and health insurance for herself and the children. If hired, the children could attend the school.

¶ 73    In Illinois, Alisha taught piano lessons and voice lessons. She also played piano every other weekend at First Presbyterian Church. She attempted to get a job as a school music teacher in Illinois, contacting Aurora Christian Academy in 2022 after the divorce, but they did not hire her (based upon their philosophies). Alisha does not have certifications as a teacher, which

precludes employment in a public school in Illinois. In Idaho, she does not need a certification to work at a charter school. There are no charter schools in the Aurora area.

¶ 74    Since residing in Idaho, the children have calls with Joshua and Alisha encourages the children to speak to their father. Often, they do not want to talk on the phone. She believes that the children can have a loving and healthy relationship with Joshua if they live in Idaho. It will be difficult for the children to be removed from Idaho because their mental health has improved there, they have made strong friendships, enjoy their home and the area, and enjoy Kevin and his children. They call it home, and they have a better life in Idaho.

¶ 75    Alisha believes that Joshua needs to attend therapy. If he did so, she would be willing for the kids to have visits and for him to visit the children. If relocation to Idaho is denied, it would devastate her financially because she would have no job. The rental market is higher than in Coeur d'Alene, and she could not provide the same home. Alisha would not move to the same area in Illinois, and the children will not return to the same school.

¶ 76    On cross-examination, Alisha denied that she wants to remove Joshua from the children's lives. Part of the reason she first considered moving to Coeur d'Alene was because Kevin lived there. She would not have considered the city if Kevin was not there. In March 2023, about three months after starting to date Kevin seriously, she told Joshua that she might want to move to Idaho. Kevin has lived in Idaho for about 15 years. Alisha has no family there. She acknowledged that, during her deposition, she referred to Joshua as the children's biological father. Kevin is a father figure to them. He is a better role model for them than Joshua. Kevin is a more appropriate person to spend time with the children than Joshua.

¶ 77    Alisha and Kevin do not have a wedding date. She was granted leave to temporarily relocate on December 11, 2023, and went, on December 18, 2023, to Pennsylvania. Alisha did

not tell Joshua that she was moving to Idaho; rather, she told him that she would be unavailable due to a family emergency. She was afraid of what he might do. The December 11 order restricted Joshua's parenting time; it provided that, temporarily, he would receive no parenting time. However, Alisha let him see the children on December 12.

¶ 78 Alisha filed her relocation petition in October 2023 and stated therein that she wanted to move because she had a job opportunity at Classical Christian Academy. She had an initial meeting with the headmaster prior to November and received the offer in November 2023 after a formal meeting with the headmaster (there was no discussion about compensation or a start date). Between the date of the divorce and the filing of her relocation petition, Alisha did not apply for a similar job in Illinois. Her current gross monthly income from working as a piano instructor is $100 per month. In 2023, her annual income was $6,300.

¶ 79 As of the date of the hearing, Alisha had a job prospect at Kootenai Classical Academy. At her deposition, on June 17, she testified that she was not actively applying for jobs in Coeur d'Alene. She had also testified that she was working minimally because she had the children 100% of the time. Based on her new job prospect, her schedule will be the same as the children's.

¶ 80 Alisha has bachelor's and master's degrees in vocal performance. She also took a continuing education course in elementary experience. Between about 2005 and 2008, Alisha worked as a kindergarten-to-fifth grade general music teacher at Harvest Christian Academy in Elgin and a fourth and fifth grade band director. Also, while in Illinois, Alisha worked on bathroom renovations, but her income was not reflected on tax returns. The monthly mortgage on the Aurora residence was $1,800. She listed the residence for sale on January 13 after she learned that Joshua was objecting to her move to Idaho. Her monthly lease payment in Idaho is $2,600. Part of the reason Alisha rented a house in Idaho rather than buying one is because she could not

afford a home similar to the one she had in Aurora. One of the reasons she likes Idaho is because of the superior schools. Prior to the move to Idaho, the children were doing well in school. Clara had some issues but saw the school social worker and a therapist. Alisha did not discuss with Joshua the decision to put the children in their school in Idaho or the decision whether to enroll them in private versus public school there. Alisha initially compared schools using the GreatSchools.com rating. At her deposition, she was not aware what metrics the site uses. Nor was Alisha aware of the college placement rate of West Aurora High School versus Coeur d'Alene public schools, the graduation rate of the districts, or the average class sizes. She is aware that Coeur d'Alene schools are less racially and ethnically diverse than Aurora public schools. Alisha is also aware there are much better schools in communities around Aurora than the elementary school her children attended in Aurora. She did not consider moving her children to a better district in the Aurora area because she could not afford it.

¶ 81    In her petition, Alisha alleged that the children called Joshua scary daddy, but that was four years ago; they do not currently call him that. Joshua is current with child support and expense reimbursements. At her deposition, Alisha was asked to identify the children's pediatrician and replied that they were usually taken to urgent care. At trial, she testified that the children had a pediatrician in Illinois, specifically, VNA Healthcare. Alisha did not recall this at the time of her deposition. They went to urgent care for sickness.

¶ 82    Alisha had not informed Joshua of the children's parent-teacher conferences in Idaho. Nor did she inform him that Gavin had a fifth-grade graduation ceremony; rather, Gavin informed Joshua. Kevin attended the graduation. Alisha did not inform Joshua of Gavin's baseball games; Kevin attended the games. When Alisha moved to Idaho, she blocked Joshua's phone number. He could contact Alisha via email. A court order was entered that there were to be regular phone

calls with the children. Prior to the court order, Alisha did not encourage the children to call Joshua unless they asked to do so.

¶ 83    Alisha and Joshua did not precisely follow the parenting plan. Joshua exercised Tuesday overnights and an overnight on the weekend. He was frequently with the children throughout 2023. He often took the children to activities that occurred during Alisha's parenting time. He took them to Awana on Wednesday nights, to church on Sunday, he took Clara to gymnastics on Monday and took Gavin to baseball practices and some games. At her deposition, Alisha testified that Joshua's positive qualities were that he took the children to activities. Her understanding is that Joshua's reasons for objecting to the relocation are that he wants to control Alisha and the children. "I think his narcissistic personality wants us to all fit in the box that we're supposed to stay in." Alisha believes that Joshua wants the children back for his own interests, not the children's. As circumstances currently exist, she believes that Joshua should have no parenting time if she is allowed to relocate.

¶ 84    Kevin is a better role model for the children than Joshua because he is kind, empathetic to their emotional needs, compassionate, and patient. He does not yell and puts other's needs before his own. If Joshua's mental health was better, she would want him to be around the children. At her deposition, she stated that she would love for the kids to be around their biological father.

¶ 85    Alisha had contacted Aurora Christian during her job search but did not formally apply for a job. She did not discuss with Joshua a school choice in Idaho because the December 12, 2023, court order gave her sole decision-making authority.

¶ 86                                         6. Joshua

¶ 87    Joshua testified during his case in chief that he objects to the relocation because the kids were well involved with their community in Aurora, they loved the neighborhood, did well in

school, had many friends, and were involved in activities. He believes it is important for the children to be close to both parents. He wants to have as much in-person and one-on-one time with them as possible. Addressing Gavin, Joshua testified that, in 2023, he saw Gavin multiple times per week. Since the move to Idaho, Joshua has spoken to Gavin 18 times over 6½ months. He has enjoyed speaking to him about baseball, going to baseball games with him, fishing at Blackberry Farm, and doing activities with Gavin's friends. Clara loves animals and has a caring heart. In 2023, Joshua saw Clara multiple times per week. Since the move, he has spoken to her about 13 times over the first 6½ months. Caitlyn and Joshua went to parks and her friends' homes, fished, and rode the train and horses at Blackberry Farm. Grace also loves parks, and Joshua took her to parks in their Aurora neighborhood. They also went to the library.

¶ 88 Joshua further testified that he did not get a two-bedroom or bigger place to live, because it was not financially feasible for him, given the rental and housing markets. Also, he did not need to obtain a larger home because he was seeing the children regularly where he was living. In 2023, in a typical month, Joshua saw the children 28 out of 30 days. He took Gavin to every baseball practice and took Clara to gymnastics once per week. At baseball practices, Joshua was initially an observer and then, in the summer of 2023, he became more involved and helped at practices. Gavin's bedwetting started before the divorce. It happened at both Joshua's and Alisha's homes.

¶ 89 Joshua took the children to Awana on Wednesday evenings. Joshua testified that his faith is a big part of his life, and he took the children to church every week that he had them. He has family in Illinois, including his parents, brother, and his brother's family. The children saw their cousins, who were of similar ages, about twice per month. The children also saw Joshua's mother, who is a retired preschool teacher. They loved playing with toys there and in her back yard. Joshua's father took the older children to baseball games and other outdoor experiences.

¶ 90    Addressing the children's Aurora elementary school, Joshua testified that Alisha never raised any complaints about the school prior to her request to relocate.  All the children did well there.  None of the children have any diagnosed learning, behavioral, or mental disability.  Joshua liked the school, specifically, the children's teachers, the community, and how integrated the children were to the school.  It is a great school and a great neighborhood.

¶ 91    Addressing Alisha's testimony that the children's Idaho school is less diverse than their Aurora school, Joshua stated that relative diversity is an important factor in choosing a school.  It is important to understand different viewpoints, ways of life, backgrounds, religions, and experiences.

¶ 92    Between the date that Alisha moved to Idaho and the date of the order giving him phone calls, Joshua spoke to the children 20 times.  He believes that electronic communication is not a reasonable substitute for in-person contact with his children.  He cannot hold their attention for long.  The children now have their own phone that Alisha purchased for them; they had lost a prior phone.  Joshua does not believe that a reasonable schedule could be fashioned while still allowing for the relocation.  Even if he were granted the entire summer but minimal time during the school year, he would not easily be able to exercise one-on-one time with the children.  Joshua testified that, if Alisha were granted permanent relocation to Idaho, he is unsure if he will visit the children there.  He denied that he loses his temper when all four of the children are together and, thus, prefers one-on-one time with them.  He is unaware if Alisha obtained an outside counselor to come to the Aurora school for Clara.

¶ 93                                7. Alisha

¶ 94    In rebuttal, Alisha testified that, Gavin's bedwetting started when he was six years old.  Alisha arranged for an outside counselor to attend the Aurora school to work with Clara every

other Friday in first grade. Between the date of divorce and moving to Idaho, the children did not often spend time with Joshua's parents and brother. They saw their uncle every other month.

¶ 95                                  8. Michael Herbert

¶ 96     Michael Herbert, an owner and attorney at Herbert & Eckberg, LLC, in Aurora testified that he has hiring and firing power over Joshua at the firm. In late 2021 to late 2022 or early 2023, Joshua could not come into the office from 9 a.m. to 5 p.m. because he and another employee, Cheryl, did not get along well. Herbert wanted both to continue working for the firm. According to Herbert, Cheryl stated that Joshua was not friendly and that he was nonresponsive to her. When Herbert discussed the issue with Joshua, Joshua reacted negatively, yelling at Herbert. Herbert responded by telling Joshua that he was fired, but reconsidered after 10 minutes and told Joshua that he was not fired.

¶ 97     Herbert further testified that Joshua is a great worker and he wanted him at the firm. Joshua was excluded from the office, but Cheryl was not because they have different roles. Cheryl answers phones and communicates with customers. Joshua does not need to be in the office and can work remotely.

¶ 98                          D. Alisha's Motion to Re-open Proofs

¶ 99     On August 13, 2024, Alisha filed an emergency motion to re-open proofs, asserting that, that day, she received, via email, a formal job offer from Kootenai Classical. She requested that the court re-open her case to allow her to admit evidence regarding the formal offer, arguing the evidence should be considered by the court in determining whether she and the children could permanently relocate to Idaho. On August 14, 2024, the court granted Alisha's emergency motion for the limited purpose of admitting evidence and noted that the parties stipulated and agreed to enter her exhibit into evidence.

¶ 100          E. Trial Court's Ruling – Permanent Relocation and Petition to Restrict

¶ 101   On August 15, 2024, the trial court denied count II of Alisha's relocation petition and granted her petition to restrict, ordering her to return to the area of her prior Aurora residence and the children to be enrolled in school no later than September 2, 2024.  The court determined that, based on the totality of the circumstances and having weighed all the statutory factors, Alisha's relocation to Idaho was not in the children's best interests and, thus, denied her petition.  As to the permanent relocation, the court made extensive oral findings, addressing each statutory factor, which we address in our analysis below.

¶ 102   The court also found that Joshua had seriously endangered the mental or moral health of the children and that restrictions were appropriate.  It enjoined Joshua from: wearing his wedding ring in the children's presence; displaying pictures or images of Alisha in their presence; sending any unsolicited gift to Alisha; praying for the reunification of the family in the children's presence; and praying for Alisha in their presence.  The court also ordered Joshua to undergo psychological evaluation (to be scheduled by August 22) and to comply with all recommendations.  It ordered Joshua to sign relevant releases so that the evaluator could communicate with the GAL prior to completion of the evaluation and to provide Alisha the evaluation and, upon her request, proof of his compliance with the evaluation's recommendations.  The court also ordered the parties to register for OurFamilyWizard by August 17 and that all non-emergency communication be on that platform.  It ordered that the communications between the parties pertain to the children and relate to parenting time or the significant decision-making responsibilities and communications previously ordered in the allocation judgment.  It discharged the GAL.

¶ 103   The court stated that,

"it is not immune to the consequences of its decision today. The Court understands that [Alisha] has been placed in a very difficult situation by [Joshua]. Notwithstanding that again the Court does not believe that relocation is the appropriate remedy.

The Court wishes that we could go back in time, that the merits of this case could have been heard prior to [Alisha's] relocation to Idaho but again the Court believes that that order entered without prejudice and therefore [Joshua] was certainly entitled to a hearing on the merits of the petition for permanent relocation."

¶ 104   On the same day, Alisha appealed to this court and filed in the trial court an emergency motion to stay enforcement of the court's August 15 order, noting that she sought to preserve the status quo pending her appeal.

¶ 105   On October 1, 2024, Alisha petitioned this court to supplement the record on appeal, noting that, on August 15, 2024, she filed an emergency motion to stay the order requiring her to return with the children to Illinois on or before September 2, 2024, pending appeal and noting that the trial court granted the motion on August 16, 2024, (and an order reflecting this was entered on August 20, 2024). She alleged that the emergency motion and August 20 order were not included in the record filed with this court on September 19, 2024, and argued that, because the order relates to the relocation, it should be included in the record on appeal. On October 3, 2024, Joshua objected, arguing that Alisha's notice of appeal did not indicate that she was appealing the decision relative to the stay, that the motion related to an ancillary matter affecting only the enforceability of the final judgment, and that granting the motion could potentially lead to a revised briefing schedule in this accelerated case. This court, on October 7, 2024, denied Alisha's motion.

¶ 106                                    II. ANALYSIS

¶ 107 Alisha argues that the trial court erred in denying the permanent relocation count (count II) of her relocation petition. She contends that: (1) the court failed to consider the impact of the temporary relocation on the children and herself; (2) the GAL and the court failed to ascertain the children's wishes as to relocation; (3) the court failed to consider Joshua's unhealthy behavior toward Alisha and his lack of involvement with the children and litigation; and (4) the court erred in determining that Alisha's reasons for moving to Idaho weighed against relocation by failing to recognize her motive to leave an abusive situation, to maintain the children's current emotional state in Idaho, and her significant improvement in her financial situation. For the following reasons, we affirm.

¶ 108 Under section 609.2(b) of the Illinois Marriage and Dissolution of Marriage Act (Act), any parent with majority or equal parenting time may seek to relocate with the minor children. *Id.* § 609.2(b). If the other parent objects to the proposed relocation, the parent wishing to relocate must file a petition with the court seeking permission to move. *Id.* § 609.2(f). When determining whether to grant the petition, the court must consider section 609.2(g) of the Act, which provides:

"(g) The court shall modify the parenting plan or allocation judgment in accordance with the child's best interests. The court shall consider the following factors:

(1) the circumstances and reasons for the intended relocation;

(2) the reasons, if any, why a parent is objecting to the intended relocation;

(3) the history and quality of each parent's relationship with the child and specifically whether a parent has substantially failed or refused to exercise the parental responsibilities allocated to him or her under the parenting plan or allocation judgment;

(4) the educational opportunities for the child at the existing location and at the proposed new location;

(5) the presence or absence of extended family at the existing location and at the proposed new location;

(6) the anticipated impact of the relocation on the child;

(7) whether the court will be able to fashion a reasonable allocation of parental responsibilities between all parents if the relocation occurs;

(8) the wishes of the child, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation;

(9) possible arrangements for the exercise of parental responsibilities appropriate to the parents' resources and circumstances and the developmental level of the child;

(10) minimization of the impairment to a parent-child relationship caused by a parent's relocation; and

(11) any other relevant factors bearing on the child's best interests." *Id.* § 609.2(g).

¶ 109 "The party seeking judicial approval of the proposed relocation must establish by a preponderance of the evidence that the relocation is in the child's best interests." *In re Marriage of Kavchak*, 2018 IL App (2d) 170853, ¶ 65 (citing *In re Marriage of Eckert*, 119 Ill. 2d 316, 325 (1988)). The determination of a child's best interests cannot be reduced to a bright-line test. Rather, it must be made on a case-by-case basis as such a determination is largely dependent upon the specific circumstances of each case. *Id.* A reviewing court will not reweigh the statutory factors. "It is not the function of this court to reweigh the evidence or assess the credibility of testimony and set aside the trial court's determination merely because a different conclusion could have been drawn from the evidence." *In re P.D.*, 2017 IL App (2d) 170355, ¶ 19. Additionally, the result cannot be reduced to a "tally" of which party "won" each factor and whether more factors benefited one party or the other. *In re Marriage of Levites*, 2021 IL App (2d) 200552, ¶ 71.

"[B]ecause some factors in a particular case may weigh more heavily than others, the trial court must consider all factors and evidence touching on the issue and must arrive at a reasonable result." *Id.*

¶ 110   We review the trial court's determination deferentially, as it is in a better position "to observe both the parents *** and therefore it is able to assess and evaluate their temperaments, personalities, and capabilities." *Id.*  Accordingly, "[a] trial court's determination of what is in the best interests of the child should not be reversed unless it is clearly against the manifest weight of the evidence and it appears that a manifest injustice has occurred." *Eckert*, 119 Ill. 2d at 328.  A decision is against the manifest weight of the evidence only where it is unreasonable. *Kavchak*, 2018 IL App (2d) 170853, ¶ 65.

¶ 111                               A. Impact of Temporary Relocation

¶ 112   First, Alisha argues that, in assessing permanent relocation, the trial court erred in failing to consider the impact on the children and herself of the temporary relocation.  She notes that, on December 12, 2023, the court determined that a temporary relocation to Idaho was in the children's best interests.  Alisha contends that, although a temporary order is entered without prejudice and is temporary in nature, the trial court permitted the minor children to move across the country.  She argues that the move and their lives in Idaho are, therefore, relevant considerations.  According to Alisha, neither the court nor the GAL placed much weight on the children's current lives in Idaho and Joshua's involvement with the children after the move.  The trial evidence, Alisa argues, showed that the children enjoy Idaho, their home, neighborhood, school, and friends.  Also, it is undisputed, she contends, that their emotional health has improved since the move, and they are excelling academically.  The GAL, Alisha argues, did not interview any Idaho witnesses, including the children's teachers, friends, neighbors, and coaches.  The GAL testified that the children enjoy

their life in Idaho, but, as with the trial court, did not place much weight on the children thriving in Idaho. She also notes that, as a result of the temporary order, she sold her Aurora residence and spent $35,000 moving to Idaho.

¶ 113 Joshua responds that the court was correct not to assign substantial, if any, weight to the fact that the children resided in Idaho for a period prior to trial. Further, the court considered facts and circumstances that existed during the temporary relocation period and assigned them their due weight.

¶ 114 Section 603.5(a-5) of the Act provides, in relevant part, that "[a] court may order the relocation of the child on a temporary basis before the entry of a final allocation judgment if it is in the best interests of the child" and that such relocations "shall be considered temporary in nature and shall not prejudice either parent in the allocation of parental responsibilities contained in a final allocation judgment." *Id.* § 603.5(a-5). The trial court noted that the temporary relocation order was entered without prejudice, thus, the temporary relocation carried no weight. To the extent that Alisha contends that she relied on the temporary order and that some weight should be placed on such reliance, she misconstrues the Act.

¶ 115 Although the court acknowledged the fact that temporary relocation cannot prejudice either party as to the final/permanent judgment, it nevertheless (and contrary to Alisha's assertion) considered the children's lives in Idaho when it considered the permanent relocation issue. As to the aspects of their lives that Alisha raises, specifically, that they enjoy Idaho, their emotional health has allegedly improved, and that they excel academically, the trial court considered these. It found that, based on its *in camera* interviews of the two older children, they enjoy their lives in both Illinois and Idaho and they enjoy activities in Idaho that they did not do in Illinois. As to Gavin's bedwetting, no evidence suggested that Joshua caused it, and Gavin continues to wear an

alarm. As to Clara's anxiety, the court determined that it occurred regardless of which parent dropped her off at school and that no evidence suggested that Joshua caused it. This finding was supported by the evidence. The court also addressed educational opportunities, finding that the Idaho elementary school was rated higher than the Aurora school pursuant to GreatSchool's rating, but that the middle and high schools have similar ratings, and there is greater diversity in Aurora and the children have succeeded at both elementary schools. The evidence supported the court's findings, as it found the GAL credible on this issue. Also, Alisha testified that, prior to the move to Idaho, the children were doing well in elementary school in Aurora. Addressing the children's Aurora elementary school, Joshua testified that Alisha never raised any complaints about the school prior to her request to relocate, and he stated that all the children did well there.

¶ 116 Finally, we reject Alisha's assertion that the GAL failed to interview Idaho witnesses, such as the children's teachers, friends, neighbors, and coaches. The GAL testified that, when making a list of witnesses with whom he wishes to speak, he asks the parties for names. In this case, he spoke to everyone on the parties' witness list, excluding one of Alisha's witnesses who never returned his calls. Thus, Alisha's argument is not well taken, as she had the opportunity to provide witness information to the GAL and does not contend that the GAL did not interview particular witnesses whose information she provided. She did not provide the names of potential Idaho witnesses, and, now, cannot complain when she did not take advantage of this option.

¶ 117                                    B. Statutory Factors

¶ 118                          1. Circumstances and Reasons for Relocation

¶ 119 Addressing the first factor, the circumstances and reasons for the intended relocation, Alisha argues that the trial court erred in determining that this factor weighed against relocation.

¶ 120    The trial court found that, although her relocation petition alleged that she had a job offer at a private school where the children would be able to attend at no charge, Alisha did not have a job offer at the time she filed her petition and the ability to attend at no charge did not come to fruition.  The court noted that, the prior day, it received evidence by stipulation that Alisha had received a job offer at the school that may allow the children to attend at no charge.  However, the court determined that the primary reason for Alisha's desire to move to Idaho was her significant other, and, but for her relationship, Idaho would not have been considered.  The court also found that the job Alisha obtained in Idaho and the jobs she sought are not particular to the Idaho area and there are jobs of the type she seeks in Illinois that she could have sought before petitioning to relocate.  It determined that the initial job offer and the school attendance "did not become reality." It further found that Alisha "wanted as much distance between herself and [Joshua] and the minor children[,] and [Alisha] was concerned that he was overbearing and potentially dangerous.  She was of the belief that [Joshua] jeopardized the wellbeing of the children by his anger and the inability to get over the parties' divorce."  The court also found that Alisha did not provide advance notice of her intention to relocate, as required by the statute.  It noted that it could consider this factor in determining whether Alisha was attempting to make the move in good faith.  It determined that Alisha's reasons for relocating ultimately weighed against the relocation to Idaho.  (It also noted that the temporary order was entered without prejudice, thus, the temporary relocation carried no weight).

¶ 121    Alisha contends that the court failed to recognize her motive to leave an abusive situation, to maintain the children's current emotional state in Idaho, and her significant improvement in her financial situation.  She maintains that the court found her testimony regarding Joshua's intimidating actions credible and expressed concern over his mental health; however, it did not

consider these factors sufficient for Alisha's motive to relocate. Alisha also contends that the court did not consider, as her motivation to permanently relocate, the children's improved emotional health in Idaho. She points to Clara's anxiety and Gavin's bedwetting, along with her testimony that Clara had night terrors in Illinois. Alisha notes that the trial court noted these issues no longer existed in Idaho but found no evidence suggested Joshua caused them, while also finding, in addressing Alisha's petition to restrict, that Joshua seriously endangered the children's mental health by wearing his wedding ring, keeping a photo of the couple on his phone home screen, sending flowers and gifts to Alisha, and praying with the children that the family be reunited. She argues that the issues in the relocation petition and the petition to restrict overlapped; however, while the court found that Joshua's behavior a serious endangerment to the children, it did not apply that determination in its findings regarding the relocation.

¶ 122   Finally, Alisha argues that the court failed to consider the improvement to her financial situation by residing in Idaho. She takes issue with court's finding that she could have found suitable employment in Illinois, asserting that she had difficulty finding employment in this state as a teacher because she does not have certification and had difficulty obtaining employment at Aurora Christian because of the school's philosophies. She was able to find employment in Coeur d'Alene at a charter school, where she will earn $48,000 per year. By contrast, she notes, she earned $6,300 in Illinois in 2022 and $6,150 in 2023.

¶ 123   Joshua responds that the court found that relocation was not the appropriate remedy to address his behaviors. This shows, he urges, that the court considered Alisha's concerns about Joshua's conduct relative to her reasons for relocating, although it did not weigh them as she sought. The court imposed restrictions on Joshua's parenting time to remedy the alleged conduct, he notes.

¶ 124   As to Alisha's financial situation, Joshua argues that the record does not support her assertion, and he contends that any claimed benefit is questionable due to her job search history. Joshua notes that, in her petition to relocate, Alisha alleged that she sought to move because of a job opportunity at Classical Christian Academy in Coeur d'Alene. She testified that she received the offer in November 2023, one month *after* she filed her petition, and that she had a job offer waiting for her. However, the headmaster stepped down and the school hired another candidate. As of the date of her deposition in June, she was not actively applying for jobs in Idaho. After her deposition, she applied for a new job and was anticipating board approval for an offer from Kootenai Classical Academy, where she would earn $48,000 per year along with benefits. Between the date of the divorce and the date she filed her relocation petition, Alisha did not apply for any teaching jobs in Illinois. She also noted that her tax return did not reflect income from remodeling bathrooms. Joshua argues that she cannot argue that her income will increase with her new job in Idaho where the records does not show what Alisha earned through all employment in Illinois. Further, she testified that her mortgage in Illinois was $1,800 per month, whereas her rent in Idaho is $2,600 per month. Thus, he argues, it is unclear how the children's standard of living will be enhanced by living in Idaho.

¶ 125   We conclude that the court did not err in assessing this factor. The GAL did not believe Alisha's reasons for relocation—her concerns for Joshua's mental health and emotional abuse— and related that Alisha's father stated that Alisha's *primary* reason for moving was to be with her significant other (and, we note, Alisha testified this was one of her reasons) and, *secondly*, that she was fearful of staying close to Joshua. The GAL opined that Alisha's reasons did not outweigh staying in Illinois. As to Alisha's concerns about Joshua's mental health and emotional abuse, the GAL testified that he "did not see" that the children spending time with their father was torture to

them. He opined that both parents are loving parents and that the children love both parents. He noted, and the parties did not dispute, that the parties did not follow the allocation judgment and that Joshua had liberal parenting time with the children in Illinois. According to the GAL, Joshua saw the children four or five days per week. Two of the children—Clara and Caitlyn—told the GAL that they missed their "daddy nights" after they moved to Idaho. The children reported to the GAL that they missed Joshua and Aurora. The GAL opined that the children were thriving in Illinois and appeared to be thriving in Idaho.

¶ 126 Joshua's mental health was a clear concern, and the GAL acknowledged that it could impact the children, although he opined that it did not weigh in favor of permanent relocation to Idaho. He spoke to the parties' counselor, who stated that Alisha had misrepresented advice he gave, and told the GAL that he never believed that Joshua was suicidal, homicidal, or required involuntary commitment, and he never had concerns relating to Joshua and the children. The trial court, in its order relating to the petition to restrict, from which Joshua has not appealed, imposed requirements to address Joshua's mental health issues. Further, the court reasonably discounted Alisha's testimony concerning her financial prospects in Idaho. The evidence showed that her job search in Illinois was minimal and that her monthly housing expenses were lower in Illinois. Finally, we cannot conclude that the court erred in determining that Alisha's failure to provide Joshua notice that she was moving to Idaho, which she conceded, was a factor in assessing her good faith in making the move. In sum, the court did not err in determining that this factor weighed against relocation.

¶ 127                    2. Objection to Relocation

¶ 128                    3. History and Quality of Parental Relationships

¶ 129   Alisha's next argument addresses the second and third factors together.  The second factor requires the court to consider the reasons, if any, why a parent is objecting to the intended relocation, and the third factor requires the court to consider the history and quality of each parent's relationship with the children and specifically whether the parent has substantially failed or refused to exercise parental responsibilities allocated to them.  Alisha contends that, in assessing the two factors, the court erred by failing to consider Joshua's unhealthy behavior toward her and his lack of involvement with the children and the litigation.

¶ 130   Addressing the second factor, the trial court found that Joshua's bases for objecting—that it will negatively impact his relationship with the children and diminish his time seeing them in person—were rational and legitimate.  As to the third factor, the court found that, historically, Alisha has been the primary caretaker and that the children have a wonderful relationship with her.  Joshua has, historically, seen the children four to five days per week, although not in accordance with the allocation judgment.  It determined that it could not find that Joshua substantially failed or refused to exercise his parenting responsibilities and that the parties' deviation from the parenting schedule weighed against the relocation.

¶ 131   Alisha notes that, in June 2023, Joshua was made aware of her desire to move to Idaho, and, in October 2023, she filed her relocation petition.  The petition was sent to Joshua's email, an address he testified is the email address he used throughout the divorce proceedings and the one he used at the time of trial.  He also, she further notes, acknowledged receiving an email on October 2, 2023, with the notice and the petition.  Despite receiving this notice, Joshua failed to appear on October 17, 2023, the date the petition was scheduled for presentation, and he subsequently did not contact the mediator and failed to appear at the hearing on the petition on December 12, 2023.

Alisha also notes that Joshua testified that he chose not to appear in court, despite the possibility that the children could be granted leave to relocate to Idaho.

¶ 132    Alisha also focuses on the children's lives in Idaho, arguing that Joshua did not involve himself in their lives there.  He has not, she contends, contacted teachers, attended school conferences, or contacted the children's coaches.  Nor did he ask Alisha or anyone else what school the children attended, who their doctors are, or seek out information about Gavin's baseball games.  Joshua did not visit Idaho or sign up for OurFamilyWizard to communicate with Alisha regarding the children, despite a court order to do so.

¶ 133    Alisha contends that Joshua's motive in objecting to the relocation does not relate to his concern over the impact on his relationship with the children.  She argues that Joshua's motives are not genuine or legitimate, where he failed to involve himself in their lives in Idaho, made it clear he would only be involved on his terms, testified he is not certain he would visit Idaho if they permanently relocated there, and is not sure if he can place the children's needs above his own if they remain in Idaho.  Alisha also argues that Joshua has an unhealthy obsession with her, which should have been considered as part of his motive for objecting to the relocation.  He prayed over the children that the parties would get back together, wore his wedding ring, sent her flowers despite her request to stop, texted her that he prayed for her, and maintained a picture of himself and Alisha on his home screen.

¶ 134    Joshua responds that Alisha's assertions are not supported by the record.  He notes that his parenting time was restricted on December 11, 2023, at Alisha's request.  The restrictions were lifted on May 7, 2024, and, as part of that order, he was granted leave to file a motion to set interim parenting time pending hearing on the relocation; he did so on May 14, 2024, and Alisha filed a response, arguing that he be denied liberal parenting time in Illinois.  Joshua notes that the trial

court entered a temporary order on May 29, 2024, granting him parenting time from June 15 to June 23, 2024, and two consecutive weeks in July, both of which he exercised. He contends that he cannot be faulted for not taking more time than allowed by the court or offered to him. He also notes that Alisha never granted him permission to visit Idaho, thus, he cannot be faulted for not taking more time than was offered to him.

¶ 135 Joshua also argues that Alisha did not facilitate his involvement in the children's academic and extracurricular activities. She did not discuss with him her choice of Idaho elementary school prior to enrolling the children there. Although, he contends, she had ultimate decision-making authority, the allocation judgment requires her to seek Joshua's input and solicit agreement prior to making a decision. Aisha also did not inform him of the children's parent-teacher conferences and failed to inform him of Gavin's fifth grade ceremony and baseball games. She also blocked his phone number. Finally, Joshua contends that his answer to ambiguous questions concerning placing his needs above the children and the evidence concerning his desire to reconcile, do not show a suspect motive.

¶ 136 We conclude that the trial court did not err in assessing the factors relating to Joshua's bases for objecting and his relationship with the children and exercise of parenting responsibilities. As Joshua notes, his parenting time was restricted and, once he was granted parenting time, he exercised it. As to his inquiries into the children's activities, he correctly notes that Alisha had been granted sole decision-making authority for the children on December 12, 2023, (which was vacated on May 7, 2024). Also, Joshua testified that, between the date that Alisha moved to Idaho and the date of the order granting him phone calls, he spoke to the children 20 times. The GAL testified that Joshua is a loving parent and addressed Joshua's mental health, opining that Joshua struggled with the divorce, potentially had depression, and was not adequately addressing his

issues. The court primarily addressed Joshua's mental health issues in its order relating to the petition to restrict. Further, as Joshua notes, his parenting time was restricted for a period because of the temporary relocation order and Alisha was granted sole decision-making authority. Finally, as the court found, the parties' deviation from the allocation judgment, which resulted in Joshua being granted more parenting time, weighed against permanent relocation.

¶ 137                                    4. Educational Opportunities

¶ 138   As to the fourth factor, the court addressed the educational opportunities for the children at the existing location and at the proposed new location. It found that the Idaho school was higher rated than the Aurora school pursuant to GreatSchool's rating and that the middle and high schools have similar ratings. There is greater diversity in Aurora, and the children have succeeded in both schools. The court noted that it heard no evidence relating to the new school the children might attend. It determined that this factor was neutral.

¶ 139   Alisha does not challenge this finding, and we conclude that the court did not err in its assessment. The court addressed all the evidence concerning the quality of the respective schools in each location and acknowledged the lack of information concerning Kootenai Classical, the offer from which prompted Alisha's motion to reopen proofs. Its resolution of the evidence was reasonable.

¶ 140                                    5. Extended Family's Presence

¶ 141   The fifth factor, the presence or absence of extended family at the existing location and at the proposed new location, the court found, weighed against relocation. It found that the children have no extended family in Idaho, but have paternal grandparents, an uncle, and several cousins in the Aurora area. The court acknowledged the dispute over how much time the children spent with extended family.

¶ 142  Alisha does not raise any argument concerning this factor or the court's findings. We conclude that the court did not err in assessing the factor. Most of the evidence concerning extended family was undisputed, and the court acknowledged the disputed evidence concerning the time spent with Joshua's family. We cannot conclude that its findings were erroneous.

¶ 143                    6. Anticipated Impact on Children

¶ 144  The sixth factor, the anticipated impact of the relocation on the children, the court found, weighed against relocation. It found that the children would not struggle in school in either location, and they have made friends in both locations and would continue to do so. However, a relocation to Idaho would preclude one-on-one time with Joshua, a desire they expressed to the GAL. The court found that the children have missed Joshua while residing in Idaho, and it noted the GAL's statement that Caitlyn asked her sister if she was dreaming when she visited the Aurora area over the summer. This showed, the court determined, that she was extremely excited to see Joshua and had missed him after not seeing him for an extended period. Addressing Gavin's bedwetting, the court found that it predated the divorce and there was no evidence that Joshua caused the issue. As to Clara's anxiety, the court found that it occurred regardless of which parent dropped her off at school and that no evidence suggested that Joshua specifically caused the issue.

¶ 145  Alisha does not challenge the court's findings on this factor, and we conclude that the court's assessment was not erroneous. The GAL testified that the children love both parents and that both parents are loving parents. The evidence was undisputed that the children excelled in school in both Illinois and Idaho, and, as the court determined, made friends in both locations. The GAL addressed Alisha's claims that the children viewed time with Joshua as torture, opining that this was not his impression from his observations of the family. It was for the court to resolve this dispute, and we cannot conclude that its findings were unreasonable given the children's reports

of their relationship with Joshua. The children reported to the GAL that they enjoyed their visits with Joshua over the summer of 2024, the girls reported missing their "daddy nights," the children stated that they missed their father. As to the court's finding regarding Clara's anxiety, it was undisputed that it occurred regardless of which parent dropped her off at her Aurora school. As to Gavin's bedwetting, Alisha testified, without explanation, that he still wore an alarm in Idaho. The court also heard evidence concerning Joshua's praying for reunification, his picture of the couple on his phone, and his gifts to Alisha and addressed these issues in its order on the petition to restrict. Overall, we cannot conclude that the court erred in determining that a relocation to Idaho would preclude one-on-one time with Joshua and that this weighed against relocation.

¶ 146                    7. Allocation of Parenting Responsibilities

¶ 147   Next, addressing the seventh factor, whether the court will be able to fashion a reasonable allocation of parenting responsibilities between all parties if the relocation occurs, the court found that this factor weighed against relocation because it could not fashion a reasonable allocation. It determined that, if the children relocate, Joshua will be unable to have one-on-one time with the children that they are accustomed to in Illinois. Also, if relocation occurred, the children would spend the majority of their summers in Aurora with Joshua. As he is a real estate attorney, the summer months are his busiest work months; he testified that he is 75% busier during that time. Thus, the summer months would likely not be of the same quality such that Joshua would spend with them if he was able to spend time with them the rest of the year.

¶ 148   Alisha does not challenge these findings. We conclude that the court did not err in assessing this factor. The evidence concerning Joshua's summer work schedule was undisputed, as was the evidence concerning the amount of time he spent with the children while they were in

Illinois. The court reasonably determined that Joshua's one-on-one time could not be replicated if relocation occurred and that this factor weighed against relocation.

¶ 149                                 8. Children's Wishes

¶ 150   Next, Alisha argues that the trial court and the GAL failed to ascertain the children's wishes as to relocation. The eighth factor provides that the court shall consider the wishes of the child when considering the child's best interests, taking into account the child's maturity and ability to express reasoned and independent preferences as to relocation. The trial court determined that, based on its *in camera* interviews of the two older children, this factor was neutral because they enjoy their lives in both states. Although they enjoy activities in Idaho that they did not do in Illinois, the activities could be done on vacation to Idaho, and the court found that their wishes did not weigh strongly in favor of relocating or staying in Illinois.

¶ 151   Generally, a decision whether to interview a child *in camera* is left to the court's discretion. *In re Marriage of Jessica F. and Justin H.*, 2024 IL App (4th) 231264, ¶ 36. "Most judges do not ask the child directly where [the child] wishes to live and what visitation [the child] would desire." *In re Marriage of Wycoff*, 266 Ill. App. 3d 408, 415 (1994). Further, the Act "does not limit the trial judge to questioning the child directly as to where [the child] wishes to live[.]" *In re Marriage of Ford*, 91 Ill. App. 3d 1066, 1071 (1980).

¶ 152   Joshua initially responds that Alisha has forfeited her argument, because she did not object to the scope of the inquiry during trial. *Ford*, 91 Ill. App. 3d at 1071. Counsel received a transcript of the court's *in camera* interviews prior to the second day of trial, and no objection was raised. We agree that this issue is forfeited. Other than noting in her motion for *in camera* interviews that the GAL had not asked the children their preferences of residence, Alisha did not object at any point during trial that the questioning had not occurred.

¶ 153   Forfeiture aside, there was no error.  The GAL testified that he felt that, given their ages, it was not appropriate to ask the children their wishes about relocation.  He explained that they associate Idaho with their mom and Illinois with their dad.  In granting Alisha's motion for *in camera* interviews, the court set the parameters, specifically, that the parties submit agreed-upon questions before the interviews but that they not relate to a preference for a particular parent.  During the interviews, the children answered questions about what they liked and did not like about Idaho and Illinois, questioning that, in our view, was likely to elicit information concerning factors they valued in each location.  The court did not err in addressing the issue of the children's wishes as to relocation.

¶ 154                    9. Exercise of Parental Responsibilities

¶ 155   Factor nine, possible arrangements for the exercise of parental responsibilities appropriate to the parent's resources and circumstances and the child's developmental level, the trial court found that this factor weighed in favor of relocation to Idaho.  It determined that the parties had adequate finances for the travel that would be required for Joshua to have parenting time and that the children are able to communicate electronically with Joshua.

¶ 156   Alisha does not challenge this finding, and we cannot conclude that the court erred in its assessment.  Joshua is an attorney and testified to his income.  There was also evidence that the children currently communicate electronically with him from Idaho, although Joshua noted that it is difficult to keep the children's attention via this method.  Thus, the evidence showed that there are possible arrangements for the exercise of parental responsibilities.

¶ 157                    10. Impairment to Parent-Child Relationship

¶ 158   Next, the court addressed the tenth factor, minimization of the impairment to a parent-child relationship caused by a parent's relocation and found that it weighed against relocation.  It

determined that minimization could not occur if the children relocated to Idaho. They "would not come close to enjoying the amount of parenting time that they have previously had with" Joshua. They will not be able to have one-on-one parenting time with him, which they desire. The court also noted that, when Alisha moved to Idaho, she minimized Joshua's contact with the children and ignored requests for information; Joshua had to seek court orders to address electronic communication and in-person parenting time. The court also determined that Alisha's testimony and demeanor reflected that she intends that her significant other assume the role of a father figure to the children. "Most concerning the Court did not believe that [Alisha] thought there was anything inappropriate about this." If relocation occurred, Alisha's actions would further impair Joshua's relationship with the children.

¶ 159    Alisha raises no argument concerning this factor. We conclude that the court did not err in its assessment. The court reasonably expressed concern that Alisha referred to Joshua as merely the children's biological father. She also testified that Kevin is a father figure to the children, is a better role model for them than Joshua, and is a more appropriate person to spend time with the children. Alisha testified that she believes Joshua wants the children back for his own interests, not theirs and that Joshua should have no parenting time if she is allowed to relocate. Her opinions about the relationship will impact the minimization of any impairment to Joshua's relationship with the children caused by the relocation. Further, the distance of Idaho from Illinois would impact the relationship. Joshua, as the court reasonably found, will not have one-on-one parenting time with the children if they relocate and this is something he and the children desire. Thus, the court's finding that this factor weighed against relocation was not erroneous.

¶ 160                      11. Any Other Relevant Factors

¶ 161   Finally, the court addressed the eleventh factor, any other relevant factors bearing on the child's best interests and noted that Alisha testified about a better economic situation in Idaho but did not make any effort to obtain employment in Illinois other than one inquiry. The court found that suitable employment could be found in Illinois if she sought employment along with her education. The court also noted Alisha's testimony concerning her Illinois mortgage and her Idaho rental cost and noted her mortgage in Illinois was lower than her rental in Idaho. The court also found that Joshua still struggles with the parties' divorce. "The Court can only surmise that [Joshua's] initial failure to appear at the hearings on the petition to temporarily relocate and to restrict his parenting time were at least in part the result of his not wanting to face reality." It found credible Alisha's testimony regarding Joshua's attempts to intimidate her in person and via texts, but it did not find that relocation was the appropriate remedy to address his behavior.

¶ 162   Overall, the court determined that, based on the totality of the circumstances and having weighed all the statutory factors, Alisha's relocation to Idaho was not in the children's best interests and, thus, denied her petition.

¶ 163   We conclude that the trial court's findings on the final factor were not against the manifest weight of the evidence, nor was its assessment of the statutory factors as a whole. The court was reasonably skeptical of Alisha's claims that her career prospects in Idaho were better than in Illinois, where the evidence showed that her job search here was minimal at best. Also, her claims that housing costs would be higher in Illinois were belied by the fact that her mortgage in Illinois was lower than her rental cost in Idaho.

¶ 164   The court heard the evidence concerning the Joshua's mental health and his failure to appear at certain hearings, acknowledged Joshua's actions to intimidate Alisha, yet determined that, based on the totality of the circumstances, relocation to Idaho was not in the children's best

interests. This determination was not against the manifest weight of the evidence, given the findings above and the fact that the court addressed Joshua's mental health issues in the petition to restrict.

¶ 165                                    III. CONCLUSION

¶ 166    For the reasons stated, we affirm the judgment of the circuit court of Kane County.

¶ 167    Affirmed.